**Joe MORGAN, Plaintiff–Appellee,**

*v.*

**Bill WOESSNER, Defendant,**

**and**

**Clay Searle; Los Angeles City, Defendants–Appellants (Two Cases).**

**Nos. 91–55728, 91–55863.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 1992.

Decided Sept. 15, 1992.

Richard M. Helgeson, Asst. City Atty., Los Angeles, Cal., for defendants-appellants.

William A. Barnes, Edwin J. Wilson, Jr., Erickson, Beasley, Hewitt & Wilson, Oakland, Cal., for plaintiff-appellee.

Before: SNEED and D.W. NELSON, Circuit Judges and ROLL, District Judge.[*]

D.W. NELSON, Circuit Judge:

## I. OVERVIEW

Joe Morgan, an ex-professional baseball player, brought a Section 1983 suit against federal agent Bill Woessner, Los Angeles police officer Clay Searle, and the City of Los Angeles for harm associated with an incident at Los Angeles International Airport (LAX) in March of 1988. At the first trial, the jury found that Morgan had not been unlawfully detained. The district court, however, granted Morgan's motion for a judgment notwithstanding the verdict (JNOV) and a new trial because it found that Searle's stop of Morgan was unconstitutional as a matter of law.

At the second trial, the district court instructed the jury that the initial contact between Morgan and Searle was unconstitutional, and instructed it to determine only whether Morgan's subsequent arrest was lawful and whether Morgan suffered harm in connection with any unconstitutional conduct, and to consider Morgan's state law claims of false imprisonment, battery, and intentional infliction of emotional distress. The jury found for Morgan on all of these issues, and awarded Morgan a total of $90,000 in compensatory damages and another $450,000 in punitive damages. Searle and the City of Los Angeles appeal.[1] They challenge the grant of JNOV and the amount of punitive damages awarded, and raise several other challenges concerning the district court's ruling on jury instructions and evidentiary matters. We affirm in part, remand in part, and grant a remittitur in part.

## II. FACTS

In presiding over this case, the district court was presented with seriously conflicting factual accounts of what precisely took place between Mr. Morgan and Officer Searle at LAX. In granting a JNOV, however, the district court concluded that *even on the basis of the defendants' account,* Officer Searle's stop of Morgan was unconstitutional as a matter of law. Because the conflicting accounts are very much relevant to the question of whether the district court's grant of JNOV was proper, as well as to the secondary question of whether the punitive damages awards were justified, we find it necessary to discuss each account in some detail.

*Joe Morgan's Testimony*

On March 15, 1988, Joe Morgan was at LAX waiting for a flight to Tucson. He passed the time in the gate area, chatting with people who recognized him. At some point during his layover, he decided to make a phone call. Leaving his bags at the

---

1. Defendant Woessner was dismissed by stipulation of the parties.

waiting area, he headed to some phone banks about forty feet away. According to Morgan, while he was dialing, Agent Searle grabbed his shoulder and turned him around. Morgan asked Searle what he wanted. Searle insisted that Morgan was traveling with another person. Morgan responded that he was traveling alone, and asked again what the problem was. According to Morgan, Searle responded with words to the effect of "I'm doing a drug investigation and you're a part of it." Morgan again said he was alone; Searle insisted that Morgan was "with this guy" and told him "you are coming with me." Morgan replied, "Why am I coming with you? I didn't do anything. I am making a phone call." Searle did not tell Morgan that he was free to go.

Searle asked Morgan for identification. Morgan replied that it was in his luggage approximately forty feet away. Morgan took a step toward his luggage, and Searle grabbed his upper torso and told him, "I will put you on the ground if you don't come with me." Morgan testified that after this exchange, a bystander came up and said to the effect, "that's Joe Morgan, the baseball player, and I can identify him." Searle responded with hostility, flashing his identification and warning the bystander to back off.

Morgan testified that at that moment he began to get frightened: "Well, at that point ... I became very nervous. Before that, you know, I was standing up kind of saying, 'Hey, I don't want to go with you. Let me get my I.D.' or whatever, but he was very hostile ... I felt like it didn't matter if I did have my I.D.... He was going to do something to me.... I said to him, 'Okay. Where do you want me to go?'" According to Morgan, Searle responded by pointing over Morgan's shoulder. As Morgan turned toward that direction, Searle grabbed him around the neck from behind, forced Morgan to the floor, and handcuffed him.

While Morgan was on the ground, Agent Woessner came up with another man, Tony Floyd. As Woessner approached, Searle asked him, "You saw him swing at me,

didn't you?" According to Morgan, one of the officers asked Floyd if Morgan "was the guy that was with you?" and Floyd answered no.

Searle pulled Morgan to his feet, and led him down the concourse, past the waiting area where Morgan had just been signing autographs. As they passed Morgan's luggage, Morgan again asked to be allowed to get his identification. Searle placed his hand over Morgan's mouth and nose and led him into a small room marked "nursery." Morgan testified that he had difficulty breathing and felt totally out of control. Inside the nursery room, Floyd repeated that Morgan was not the person he was with. Morgan testified that Searle threatened to report to the press that he was a part of a narcotics investigation, and offered to release Morgan if Morgan would promise to forget what had happened. Morgan responded, "You do what you have to do, and I'll do what I have to do." After a few moments of further exchange, Searle removed the handcuffs and allowed Morgan to leave.

According to Morgan, at no time during this course of events did he make any aggressive or hostile physical gesture toward either Searle or Woessner. He testified that at no time did he resist, use profanity, or scream.

### Richard Ruybalid's Testimony

Richard Ruybalid, an individual not otherwise associated with Morgan, was on the same plane into LAX as Morgan, and was waiting for the same connecting flight to Tucson. Ruybalid had recognized Morgan on the flight, but did not speak to him. Ruybalid testified that he was making a call from the same phone bank as Morgan when Searle approached Morgan. Ruybalid's attention was caught by a "heated conversation." Ruybalid approached to within ten feet, and witnessed the confrontation between Morgan and Searle. Ruybalid heard Searle saying to Morgan, "Come along. Come with us. Come with us." Morgan responded, "No I am not going. Leave me alone. I want to get my identification." According to Ruybalid, Searle was insistent, repeating "You are coming with us. Forget it. You are coming with us right now."

Ruybalid moved in closer and said, "Hey, what are you doing? That's Joe Morgan the famous baseball player." Searle responded by flashing his I.D. and saying, "Back off, narcotics officer." Ruybalid testified that at this time Morgan was not doing anything threatening or violent, but that Morgan's demeanor was defensive, bothered, angry. Ruybalid testified that Searle was very angry and his tone of voice very stern, and that Ruybalid felt he was being ordered to leave the area by a person of authority.

Ruybalid backed away, but continued to monitor the situation, remaining within fifteen or twenty feet from Morgan and Searle. He did not see Morgan taken to the floor, but he heard the noise caused by that fall. He testified that prior to that noise, he did not hear any yelling, screaming or swearing. When he heard the noise of the fall, Ruybalid approached the men; he observed Searle pull Morgan to his feet and lead him away, holding his hand over Morgan's mouth. Ruybalid testified that Morgan walked reluctantly but did not resist, and that he did not use any profanity or scream.

*Defendants' Testimony*

On March 15, 1988, Searle and Woessner were on a routine narcotics patrol at LAX. They observed Tony Floyd, a black man, moving rapidly through the concourse. Floyd had a carry-on bag which appeared to be half-empty. Floyd made eye contact with Searle and Woessner, and then looked away. To the agents, he appeared to be nervous. Finding these actions suggestive of narcotics involvement, Searle and Woessner decided to question Floyd.

Searle and Woessner identified themselves to Floyd, and told him that he was not under arrest and that he was free to go. Floyd agreed to talk with them. They asked him for identification, but he had none. They asked to look at his ticket, and he produced a one-way cash ticket issued in a name other than Floyd. They obtained permission to search his person and his carry-on bag; they found only clothing and toiletries. They then took Floyd to the men's room and conducted a pat down search which revealed nothing illegal, but did reveal that Floyd was carrying a second ticket. Although Floyd initially claimed to be traveling alone, he eventually admitted that he had a travel companion. Floyd did not remember the second person's name, but told the agents that the second traveler should be right behind him. The agents asked Floyd what the traveler looked like; Floyd responded that "he looks like me."

Based on their exchange with Floyd, the agents concluded that Floyd was a drug courier and that his companion was the "mule," the person who actually carried the drugs. The officers handcuffed Floyd, and left the bathroom with him to look for the second traveler. As they stepped out, they observed Morgan walking in their direction. The officers testified that Morgan was not running, or dressed unusual. The only thing that linked Morgan to Floyd was that both men were black. The officers found this significant because Floyd had said that the second traveler looked like him, and in their experience couriers tended to work with people of their own ethnic group. According to Searle and Woessner, when Morgan got within twenty feet of the trio he looked directly at them, stopped, and then abruptly turned around and started walking in the direction from which he had come.

Searle followed Morgan, and approached him as he was standing facing a telephone with the receiver in his hand. According to Searle, he tapped Morgan on the shoulder, displayed his identification card, and said, "I'm a police officer." Morgan immediately replied, "I don't give a fuck who you are." When Searle asked for identification, Morgan responded by saying, "I don't have to show you shit. I don't have any identification." Searle told Morgan that he was conducting a narcotics investigation, and that he wanted to determine if Morgan was traveling with anyone. Morgan responded by stating that he hadn't done anything, and by repeatedly yelling, at louder and louder volume, "You're not a police officer." Searle stated that he handed his police identification to Morgan, and that Morgan examined it and handed it back.

At that point, Searle testified that a citizen stepped forward, but that he did not

remember him offering to identify Morgan. Searle testified only that he showed Ruybalid his I.D. and told him that he was a police officer.

Searle then told Morgan that he wanted Morgan to go with him to see if he was traveling with somebody, and gestured toward the direction of Agent Woessner. Searle testified that he did not believe Morgan was free to go at that moment, and that he believed that Morgan was required to show him some identification. Morgan kept asking "why, why," and Searle repeated his request:

> Searle: I kept explaining to him I wanted to see if he was traveling with somebody, and eventually he starts walking with me. We probably take about three or four steps before he freaks out, before he starts screaming and then yelling.
> Question: Okay. So you said, "I want to take you to some location or to take you to somebody so they can identify you?"
> Searle: I said, 'I'd like you to go with me to see if you're traveling with this person we're investigating. That's all I want to do. I want to see if you are together and then we can solve this,' and he's screaming 'why, why' at the top of his lungs, but then he starts walking with me. I'd take a step and he'd take a step with me, and we eventually take some steps toward where I last left Agent Woessner and Mr. Floyd.
> Question: So at this point, you were starting to leave the area of the phone bank?
> Searle: Yes, we did.
> Question: Okay. And about how far were you from the phone bank when you stopped again?
> Searle: Probably maybe got 10 feet away eventually.

Searle Deposition, E.R. at 138–39.

Searle and Morgan walked toward Woessner and Floyd. According to Searle,

after a few moments Morgan "freaked out" and began gesturing wildly, screaming at the top of his lungs. Woessner testified that he could hear Morgan yelling from some distance. Both officers testified that Morgan was waving his arms wildly; Searle had to duck to avoid getting hit, and at that point was bumped by Morgan's body. Searle grabbed Morgan around the chest and they fell to the floor; Searle ended up on top of Morgan. Searle testified that he told Morgan to put his hands behind his back, and that Morgan cooperated. Searle then got handcuffs from Woessner and cuffed Morgan.

Searle testified that then Morgan began screaming "Help, help" at the top of his lungs. As they walked down the concourse, Searle testified that he put his hand over Morgan's mouth to shut him up, because he was afraid that Morgan's screaming would attract attention and that "he didn't want another fight to break out with somebody else jumping in because he's screaming." Searle did not inform Morgan that he was under arrest or read him his rights. Once in the nursery room, Searle released Morgan after Floyd verified that Morgan was not his companion.

### Procedural Background

Based on this course of events, Morgan filed a complaint in the Central District of California, naming Searle, Woessner, and the City of Los Angeles as defendants. Morgan alleged that he had been falsely detained, arrested and imprisoned by Searle and Woessner, and brought eight claims under federal and state law.

Trial was held in April 1990. The record indicates that from the beginning, the district court believed that Morgan's detention was illegal as a matter of law.[2] Rather than make a finding on this issue, however, the court was silent, fearing that a directed

---

2. During the first jury's deliberations, the court remarked to counsel:

> Let me stop you for just one minute. I left one thing out ... and that is, that under no circumstances would I have permitted a jury

to decide otherwise. There isn't any possible other conclusion but that the stop was illegal. E.R. at 7. And later:

> I think you will both have to give a lot of thought to what we are going to do because there is not the slightest doubt here about the

verdict on this issue would influence the jury's deliberations regarding whether Morgan had been the aggressor in the subsequent physical altercation and whether damages were justified.[3] The jury in the first trial awarded no damages to Morgan, finding that his detention was lawful.

Morgan moved for a JNOV and a new trial, or in the alternative, asked that the district court make a finding as to damages. As noted above, the court granted a JNOV and the motion for a new trial. The second trial was held in February 1991. After both parties had put on their case, the district court instructed the jury a second time. This time, the court stated that the court had already decided that the initial contact between Searle and Morgan was a seizure unsupported by reasonable suspicion, and therefore that Searle had violated Morgan's constitutional rights.[4] After deliberations, the jury returned a verdict for Morgan on his federal civil rights and state law claims. Specifically, it found: 1) that Morgan had suffered actual harm as a result of his unlawful detention; 2) that after the initial detention, Searle violated Morgan's constitutional rights by arresting him without probable cause and using excessive force against him, causing

Morgan actual harm; and 3) that Searle falsely imprisoned Morgan, committed battery on Morgan, and intentionally inflicted emotional distress on Morgan (the state law claims). The jury awarded Morgan damages against Searle as follows: 1) claim one—$10,000 in compensatory and $150,000 in punitive damages; 2) claim two—$40,000 in compensatory and $150,000 in punitive damages; and 3) claim three—$40,000 in compensatory (awarded against defendants Searle and the City of Los Angeles) and $150,000 in punitive damages.

On February 28, 1991, the district court entered a judgment awarding Morgan a total of $90,000 in compensatory damages and $450,000 in punitive damages. The district court also awarded Morgan attorney's fees pursuant to 42 U.S.C. § 1988. Defendants Searle and the City of Los Angeles appeal.

### III.  DISCUSSION

A.  *The Judgment Notwithstanding the Verdict*

1.  Standard of Review

■■■■ We review a grant of JNOV de novo.  *Meehan v. County of Los Angeles,*

---

portion of the case that deals with detention. Now, I will agree that there is a factual issue after the detention is made, but there is no factual issue up to that point.

E.R. at 10.

**3.**  The court observed:

I think the mistake I made in this case was that I found that there was an illegal detention, and I didn't tell the jury that.... I knew that if I told the jury that there had been an illegal detention of Mr. Morgan that that would—or at least I believed that that would dictate the remainder—the outcome of the remainder of the case or at least it would so heavily weight the case on one side that it is likely they would come in and find for the plaintiff on the rest of the case because it is the clearest credibility crisis here in this case that you could ever imagine.

E.R. at 2.

**4.**  The district court gave the following instruction:

One of Mr. Morgan's claims is that he was detained by Officer Searle without due process of law, in violation of his constitutional rights....

The Court has already determined, in prior proceedings in this case, (1) that Officer Searle did detain Mr. Morgan prior to the time that any physical altercation arose between the two, and (2) that the detention was not justified by reasonable suspicion on the officer's part at that point in time. Therefore, plaintiff has established that his constitutional rights were violated in this one particular regard. It is however for you to determine if this violation was the proximate cause of damages to Mr. Morgan, and the amount of those damages.

It is also for you to determine if plaintiff has proved, by a preponderance of the evidence, that his rights were violated in any of the other ways specified in his other claims.

The Court has determined *only* that unlawful detention issue and in instructing you that the Court has made that determination, the Court does not indicate any view whatsoever as to which party is entitled to a verdict on any other issue in the case. You must reach your own fair and impartial verdict on those issues without regard to the conclusion reached by the Court with respect to the unlawful detention issue.

E.R. at 400–401.

856 F.2d 102, 106 (9th Cir.1988). "A directed verdict is proper where the evidence permits only one reasonable conclusion as to the verdict; it is inappropriate if there is substantial evidence to support a verdict for the nonmoving party." *Id.* Evidence should be viewed in the light most favorable to the nonmoving party. *Id.*

2. Analysis

In directing a verdict for Morgan, the district court concluded, as a matter of law, 1) that Morgan had been "seized" within the meaning of the Fourth Amendment, and 2) that the seizure was unconstitutional because there was no reasonable suspicion to support it. We address these legal conclusions separately.

a. *The Seizure*

■■■ Stops under the Fourth Amendment fall into three categories. First, police may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Such brief, "consensual" exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures. Second, the police may "seize" citizens for brief, investigatory stops. This class of stops is not consensual, and such stops must be supported by "reasonable suspicion." *See, e.g., Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922–23, 32 L.Ed.2d 612 (1972); *United States v. Holzman,* 871 F.2d 1496, 1502 (9th Cir.1989). Finally, police stops may be full-scale arrests. These stops, of course, are seizures, and must be supported by probable cause. *Williams,* 407 U.S. at 148–49, 92 S.Ct. at 1924.

Defendants contend that Searle did not seize or detain Morgan until *after* Morgan allegedly got violent and tried to "take a swing" at Searle. Prior to that point, they contend that because Searle was merely questioning Morgan and Morgan was free to leave, the encounter between Morgan and Searle was of the first sort: a consensual exchange not requiring either reasonable suspicion or probable cause. They contend that although Morgan was indeed seized after he allegedly became violent, the seizure was not unconstitutional because it was justified by Morgan's conduct at that point. Defendants also contend that a determination of whether Morgan was seized requires a resolution of facts in dispute, and that this issue therefore should have been left for the jury. In granting a JNOV, however, the district court found that *even on the facts as construed in the defendants' favor,* Morgan was seized well before any alleged physical altercation took place. We agree.

■■■ In considering whether a stop was a "seizure" or merely a consensual exchange, the Supreme Court has observed:

[A] person is "seized" only when by means of physical force or a show of authority, his freedom of movement is restrained.... *As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.*

*United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (emphasis added). Thus, the "essential inquiry is whether the person stopped reasonably believed that he or she was not free to leave."· *United States v. Patino,* 649 F.2d 724, 726–27 (9th Cir.1981) (citations omitted). This inquiry is largely a factual one which depends on the totality of the circumstances. *Id.* Based on the events that, according to Searle's own testimony, took place *before* Morgan allegedly "freaked out," we find that the district court was quite justified in finding that Morgan "reasonably believed" that he was not free to leave.

■■■ By definition, a "consensual" exchange between police and citizens cannot take place in the absence of consent. If a citizen agrees to answer an officer's questions, the possibility that that citizen was seized is greatly diminished. Likewise, when a citizen expresses his or her desire

*not* to cooperate, continued questioning cannot be deemed consensual. In this case, according to Searle himself, Morgan never consented or otherwise conveyed a willingness to cooperate with Searle. Rather, Searle testified that after he approached Morgan, Morgan indicated in no uncertain terms that he did not want to be bothered. Despite Morgan's unwillingness, Searle insisted that Morgan answer his inquiries and demanded that Morgan come with him.

In this critical respect, this case differs from virtually every case in which courts have deemed police/citizen exchanges consensual. *See, e.g., United States v. Johnson,* 903 F.2d 1219, 1221 (9th Cir.) (finding no seizure where police approached defendant in airport, asked if they could ask him questions, told defendant that he was free to leave and defendant responded that he understood he was free to go), *cert. denied,* —— U.S. ——, 111 S.Ct. 520, 112 L.Ed.2d 531 (1990); *United States v. $25,000 U.S. Currency,* 853 F.2d 1501, 1503–05 (9th Cir.1988) (finding no seizure where defendant was approached in airport, answered "yes" when police officers asked if they could speak to him for a few minutes, and the police officers never raised their voices or showed any signs or force or aggression). We know of no case in which a court has found a police-citizen exchange to be consensual where the citizen unequivocally expressed his or her desire to be left alone, and we decline to set such a precedent today.[5] In short, we find that Morgan's unequivocal expression of his desire to be left alone indicates that the exchange between Morgan and Searle was not consensual.

In addition to Morgan's expression of disinterest, other factors lend support to our conclusion that Morgan reasonably believed he was not free to leave. First, Searle's insistence that Morgan answer his questions may have indicated to Morgan that his cooperation was compelled. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877; *see also Martinez v. Nygaard,* 831 F.2d 822, 826 (9th Cir.1987). According to

Searle himself, Searle repeated his demands several times ("I kept saying you've got to come with me"). Moreover, that Morgan allegedly answered Searle in a hostile tone ("I don't have to show you shit") did not give Searle a "right" to demand that Morgan comply with his request, and does not otherwise alter our inquiry: "[a citizen] may not be detained even momentarily without reasonable, objective grounds for doing so; *and his refusal to listen or answer does not, without more, furnish those grounds." Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (emphasis added); *cf. also Brown v. Texas,* 443 U.S. 47, 49, 99 S.Ct. 2637, 2639, 61 L.Ed.2d 357 (1979) (no reasonable suspicion justifying seizure where police stopped defendant in an alley known for high incidence of drug traffic, and defendant "refused to identify himself and angrily asserted that the officers had no right to stop him.").

■ Second, Searle testified that he believed that Morgan was not free to go. Although an officer's subjective belief is ordinarily irrelevant to the question whether a citizen believes that he or she is free to go, it becomes relevant if there is reason to believe that the officer's belief was conveyed to the detainee. *See Mendenhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6. In this case, the fact that Searle repeatedly demanded that Morgan accompany him heightens the likelihood that Searle conveyed to Morgan his belief that Morgan was not free to go.

■ Third, Searle did not advise Morgan that he was not under arrest and that he was free to go. Although an officer's failure to advise a citizen of his freedom to walk away is not dispositive of the question of whether the citizen knew he was free to go, it is another significant indicator of what that citizen reasonably believed. *Royer,* 460 U.S. at 503, 103 S.Ct. at 1327 ("Royer was never informed that he was free to board his plane if he so chose");

---

**5.** We do not mean to imply that affirmative consent is *required* before an encounter can be considered consensual. However, the opposite—an affirmative expression of a desire to be left alone—is of critical relevance.

*Patino,* 649 F.2d at 727; *Johnson,* 903 F.2d at 1221. Fourth, according to Searle, Searle and Morgan traveled "maybe ten feet" in the direction of Woessner and Floyd before Morgan "freaked out." An officer's request that an individual accompany him to another location may tend to indicate that the individual reasonably believed that he was not free to walk away. *Royer,* 460 U.S. at 503, 103 S.Ct. at 1327 (considering facts that officers told Royer he was suspected of transporting narcotics and asked him to accompany them to the police room).

Finally, "[s]tatements which intimate that an investigation has focussed on a specific individual easily could induce a reasonable person to believe the failure to cooperate would lead only to formal detention." *United States v. Berry,* 670 F.2d 583, 597 (5th Cir.1982) (en banc). In this case, Searle conveyed to Morgan that he was the specific target of Searle's concern in two ways. First, he told Morgan specifically that he was conducting a narcotics investigation, and that he wanted Morgan to accompany him so that he could see if Morgan was traveling with a person they were investigating. Second, and more importantly, the exchange with Ruybalid, even as under Searle's characterization, communicated to Morgan that he alone was the subject of Searle's attentions. At a minimum, Ruybalid approached Searle and Morgan, and Searle flashed his police identification at Ruybalid in a way that had the effect of causing Ruybalid to retreat from the two men. Searle's hostility to Ruybalid, or at the very least his indifference to Ruybalid and his focus on Morgan, undoubtedly conveyed to Morgan that it was he alone who was the target of Searle's interest. Again, the exchange with Ru-

ybalid occurred well before Morgan allegedly became violent.[6]

On the basis of these factors, we do not hesitate to find that Morgan was indeed seized well before he allegedly got violent. The central defining characteristic of consensual encounters between the police and citizens is that they are *consensual.* A citizen must be free to withdraw at any time. In this case, according to Officer Searle himself, Joe Morgan tried to withdraw from the exchange with Searle immediately, but was prevented from doing so. Under such circumstances, we conclude without difficulty that the initial encounter between the two was not consensual. The district court correctly found that Morgan was seized within the meaning of the Fourth Amendment.

### b. *Reasonable Suspicion*

▮ Having determined that Morgan was in fact seized, we now turn to the question of whether the seizure was supported by reasonable suspicion. Clearly, it was not. At bottom, Searle stopped Morgan for two reasons: 1) Floyd's tip, which essentially made all black men suspect, and 2) the supposed fact that Morgan looked at them, turned and walked away. No court has come remotely close to finding reasonable suspicion on such a slim set of observations.

The contrast between the facts of this case and the facts of cases in which we have found reasonable suspicion is illuminating. For example, in *Holzman, supra,* we considered whether reasonable suspicion supported the seizure of defendant Holzman. Holzman was observed purchasing merchandise in a store with Walsh, a man whom the observing police officer recognized as a suspect in a credit card fraud investigation. In finding that Officer Hill

---

**6.** In addition, although the extent to which this factor is relevant is unclear, the Supreme Court has hinted that courts may consider whether "the investigative methods employed [are] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time" in determining whether the Fourth Amendment was violated. *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26; *see also Holzman,* 871 F.2d at 1501. Here, Searle, in the

same amount of time it took him to walk over to Morgan, could have walked over to Morgan accompanied by Floyd. With Floyd in tow, it would have taken a second or two to determine that Morgan was not Floyd's companion, and Morgan would not have been disturbed at all. The fact that this alternative was so readily available may weigh in the Fourth Amendment calculus.

had reasonable suspicion for his subsequent seizure of Holzman, we relied on numerous factors. These included: 1) Hill knew from the investigation that Walsh was believed to be operating with an accomplice; 2) Hill watched Holzman look on and offer direction as Walsh purchased merchandise with what appeared to be a counterfeit credit card; 3) Hill noticed that the men spoke with Eastern accents, a fact consistent with the investigation; 4) Hill observed both men continually scanning the area, and monitoring Hill's movements once they detected his presence; 5) Hill could detect large bulges in the pockets of both men's pants, which he assumed to be large wads of cash received from cash advance frauds; and 6) after Walsh was arrested, Hill observed Holzman take evasive steps and move toward an outside exit. 871 F.2d at 1502. Obviously, the factors involved in *Holzman* are far more substantive than those involved here.

The contrast between several Supreme Court cases in this area is similarly illuminating. In *Royer,* narcotics detectives observed a man whose appearance, mannerisms, luggage and actions fit their "drug courier profile." These actions included paying cash for a one-way ticket and filling in only a name and destination on the luggage identification tag (rather than an address and telephone number). The Supreme Court found that these facts, combined with the detectives' discovery that the man was traveling under an assumed name and their observation that he became increasingly nervous when speaking to them, constituted reasonable suspicion for a brief investigatory seizure. 460 U.S. at 502, 103 S.Ct. at 1326. *See also United States v. Sokolow,* 490 U.S. 1, 3, 109 S.Ct. 1581, 1583, 104 L.Ed.2d 1 (1989) (finding reasonable suspicion where defendant: 1) paid $2,100 for two airline tickets from a roll of twenty-dollar bills; 2) was thought to be traveling under an alias; 3) arrived from Miami, a drug source city; 4) stayed in Miami for only 48 hours, even though the trip from Honolulu to Miami took 20 hours; 5) appeared nervous; and 6) checked no luggage). By contrast, in *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the Court found no reasonable suspicion where the police based their stop of defendant on the facts that: 1) defendant had arrived from a source city; 2) defendant arrived early in the morning, a time when law enforcement activity is diminished; 3) defendant and a second traveler tried to conceal the fact that they were traveling together; 4) defendant had no luggage other than a shoulder bag; and 5) defendant repeatedly looked over his shoulder in the direction of the other man. *Id.* at 441, 100 S.Ct. at 2754. For the Court, these factors described a "very large category of presumably innocent travelers, who would be subject to virtually random seizures were the court to conclude that as little foundation as there was in this case could justify a seizure." *Id.*

Again, the only factors justifying the seizure of Morgan were the tip from Floyd which put agents Searle and Woessner on the lookout for all black men, and the fact that Morgan appeared to look directly at them and turn abruptly around. These facts are not nearly as substantive as the factors relied upon in *Holzman* or even in *Royer.* To the contrary, they fall short of even the factors rejected as insufficient to establish reasonable suspicion in *Reid:* there is no claim that Morgan was dressed in an unusual manner, that he was hurrying through the airport, that he was carrying anything unusual, that he seemed nervous, or that any of the other factors normally relied upon in justifying investigatory stops at airports existed. Accordingly, we agree with the district court that no reasonable suspicion justified the seizure of Morgan.

## B. *Punitive Damages Award*

### 1. Standard of Review

As an initial matter, the parties do battle over the appropriate standard of review by which an appellate court should review the district court's approval of a jury's punitive damage award.

"A jury may award damages under Section 1983 either when a defendant's con-

duct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir.1991); *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). "Unless the amount of damages is grossly excessive, unsupported by the evidence, or based solely on speculation, the reviewing court must uphold the jury's determination of the amount." *Davis*, 927 F.2d at 1485 (citing *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir.1986)).

In considering the role of the federal courts when punitive damages are based on state law claims, the Supreme Court has observed:

> In reviewing an award of punitive damages, the role of the District Court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The Court of Appeals should then review the District Court's determination *under an abuse of discretion standard.*
>
> In performing the limited function of a federal appellate court, we perceive no federal common-law standard, or compelling federal policy, which convinces us that we should not continue to accord considerable deference to a district court's decision not to order a new trial.

*Browning–Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 2922–23, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989) (emphasis added).

Defendants argue that this standard of review has been altered by the Supreme Court's latest foray into the realm of punitive damages, *Pacific Mutual Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In *Haslip*, the Court considered whether approximately $840,000 in punitive damages awarded under Alabama law violated the Due Process Clause. In finding that it did not, the Court relied on the facts that 1) the district court's jury instructions gave the jury sufficient guidance; 2) the Alabama Supreme Court had established post-trial procedures for scrutinizing punitive awards; and 3) the Alabama Supreme Court had developed criteria for guaranteeing that awards were reasonably related to the goals of deterrence and retribution. *Id.*, —— U.S. at ——, 111 S.Ct. at 1045.[7] The Court observed approvingly that these criteria distinguished Alabama's system from other state systems where awards could be set aside only if "manifestly and grossly excessive" (Vermont) or if they "evince[ ] passion, bias and prejudice on the part of the jury so as to shock the conscience" (Mississippi). *Id.*, —— U.S. at ——, 111 S.Ct. at 1045 n. 10.

Defendants contend that after *Haslip*, federal courts must review punitive damages with greater scrutiny. Specifically, they suggest that courts should review damages awards de novo. However, they do not suggest or identify the criteria which *Haslip* directs federal courts to adopt in conducting such a review. Nor could they. *Haslip* does not comment on the federal standard of review analysis set forth in *Browning–Ferris*, much less suggest new criteria for reviewing awards obtained pursuant to federal law. Indeed, *Haslip* cites to *Smith v. Wade* with approval for its holding that trial courts are to use the federal common law method in determining the amounts of awards under 42 U.S.C. § 1983. *Haslip*, —— U.S. at ——, 111 S.Ct. at 1042–43. Thus, we hardly think it clear that the Supreme Court intended *Haslip* to alter federal courts' review of punitive damages under Section 1983.

7. These criteria included: 1) whether there was a reasonable relationship between the award and the conduct; 2) the degree of reprehensibility of the conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; 3) the profitability of the conduct and the desirability of having that defendant sustain a loss; 4) the financial position of the defendant; 5) the costs of litigation; 6) the imposition of criminal sanctions, to be taken in mitigation; and 7) the existence of other civil awards, to be taken in mitigation. *Id.*

In the absence of a clear mandate from the Supreme Court, we decline to devise a new standard of review for punitive damages awards. First, we note that in cases decided after *Haslip*, our circuit has not articulated a new standard. *See Davis; Larez v. City of Los Angeles*, 946 F.2d 630, 639 (9th Cir.1991), (considering whether awards were "grossly excessive, monstrous, or shocking to the conscience.") (citing *Benigni v. City of Hemet*, 879 F.2d 473, 480 (9th Cir.1988)). More importantly, we think that the standards explicitly articulated in *Smith v. Wade* and in *Browning–Ferris* remain the appropriate standards for reviewing a trial court's decision not to grant a new trial and that deference to trial courts remains appropriate. This is especially so in the context of Section 1983 claims, where only federal common law applies and there are no state-devised post-award mechanisms for a federal court to evaluate.[8]

### 2. Analysis

In challenging the amount of punitive damages, defendants advance two arguments. First, they contend that the award amounts were excessive, particularly in light of Officer Searle's financial worth. Second, they argue that under California law, the jury and the trial court were *required* to consider the defendants' financial worth in deciding whether the amount was appropriate. Because such evidence was not presented to the jury or judge, they maintain that the state law punitive damages award cannot be affirmed on appeal.

### a. Federal Claims

■ It is well-settled that under federal law, defendants bear the burden of presenting evidence and proving financial worth. *See Davis*, 927 F.2d at 1485 (refusing to consider challenge to punitive damages on ground that police deputies could not pay because deputies did not offer evidence of net worth to the jury, and did not object when the jury was not instructed on issue); *Tri–Tron Int'l v. Velto*, 525 F.2d 432, 438 (9th Cir.1975) (refusing to interfere with award when award was not outrageously disproportionate to the situation and circumstances, and appellants had offered no evidence of financial worth); *El Ranco, Inc. v. First Nat'l Bank*, 406 F.2d 1205, 1218 (9th Cir.1968) (same), *cert. denied*, 396 U.S. 875, 90 S.Ct. 150, 154, 24 L.Ed.2d 133 (1969); *see also Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978) ("[T]he decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this consid-

---

**8.** Although we need not reach this question, we note that even if *Haslip* requires some greater scrutiny of punitive damages awards under Section 1983, the circumstances surrounding the award here still pass muster. The district court gave the following jury instruction with regards to punitive damages:

> You may in your discretion award such damages, if, but only if, you find by clear and convincing evidence that said defendant was guilty of oppression or malice in the conduct on which you base your finding of liability. 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard for the rights or safety of others. A person acts with conscious disregard of the rights and safety of others when he is aware of the probable dangerous consequences of his conduct and willfully and deliberately fails to avoid those consequences.
>
> . . . . .
>
> The law provides no fixed standards as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice.
>
> In arriving at any award of punitive damages, you are to consider the following:
>
> (1) The reprehensibility of the conduct of the defendant.
>
> (2) The amount of punitive damages which will have a deterrent effect on the defendant in the light of defendant's financial condition.
>
> (3) That the punitive damages must bear a reasonable relationship to the injury, harm, or damage actually suffered by the plaintiff.

E.R. at 428–29. These instructions appear to meet all the concerns of the *Haslip* court—they discuss the connection between the award and conduct, instruct the jury not to make an award out of passion or prejudice and to consider deterrence and retribution, and instruct the jury to consider the defendant's financial worth. *See also Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377 (5th Cir.1991) (approving Mississippi's system of awarding punitive damages where jury instructions were thorough).

ered in mitigation of damages.... Appellant chose not to offer such proof, despite his awareness of his potential liability.")

■ In this case, although defendants claim that they introduced "circumstantial evidence of [Searle's] financial condition" throughout trial, they did not actually raise this issue until they filed their motion for a new trial. At that time, they appended to their motion the declaration of a police officer testifying to the average income of a police detective, but still did not offer evidence of Searle's net worth. Moreover, the defendants failed to object to the lack of a jury instruction that would have highlighted this issue.[9] Therefore, we find that this issue has not been properly preserved for appeal.

■ With the question of financial worth set aside, then, the only question before us is whether the damages award "is grossly excessive, unsupported by the evidence, or based solely on speculation." *Davis*, 927 F.2d at 1485. Although we recognize that Mr. Morgan has suffered a great injustice, we conclude that an award of $300,000 on the federal claims is excessive. Accordingly, we reduce this amount to $100,000.

We admit that the process of determining whether a particular punitive damages award is justified is not an exact science. However, we have considered carefully the facts of this case, and compared them to the facts of analogous cases in which punitive damages awards were granted. Rarely do punitive damage awards exceed $100,-000; moreover, most of the cases we have considered involved multiple defendants who must share the punitive damage burden. *Compare Corder v. Gates*, 947 F.2d 374 (9th Cir.1991) (total of approximately $20,000 punitive and $5,000 compensatory damages in Section 1983 suit against several police officers); *Larez*, 946 F.2d at 639 (between $300 and $25,000 awarded against police officers in Section 1983 suit); *Bouman v. Block*, 940 F.2d 1211 (9th Cir.) (remanding to district court to articulate reasons for approving punitive damages

award of $106,523 in Title VII suit, but noting that award was not excessive in light of facts of case), *cert. denied,* —— U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991); *Benigni v. City of Hemet*, 879 F.2d 473 (9th Cir.1988) (punitive damages of $7,500 and $2,500 in Section 1983 suit); *Hall v. Ochs*, 817 F.2d 920, 922 (1st Cir. 1987) (punitive damages award of $200,000 in Section 1983 suit against four police officers). In light of these cases, we feel that a punitive damage award of $300,000 on two federal claims against a single defendant is simply too large.

Beyond compensating Joe Morgan for his personal ordeal, the primary goal of punitive damages is to deter conduct that offends the public at large. With this grant of remittitur, we believe that we do further those goals. A punitive damages award of $100,000 in favor of Mr. Morgan is a significant award. Moreover, we wish to make clear that our reduction is limited only to the federal punitive damages; the district court is free to award any amount up to the $150,000 on the state law claims. Therefore, we believe the total award will send to the Los Angeles Police Department yet another message that it must not and cannot abide police mistreatment of citizens. We sincerely hope that this award helps hasten the day when cases generated by conduct of this sort no longer weigh down our dockets.

### b. *Damages on State Claim*

■ The award of $150,000 on the state law claims presents a different problem. Recently, in *Adams v. Murakami*, 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991), the California Supreme Court held that an award of punitive damages cannot be properly reviewed unless the record contains evidence of a defendant's financial worth. The *Murakami* court held that such evidence must be presented to the jury, and that the burden of presentation lies with the plaintiff. Thus, defendants' contention that *Murakami* requires the tri-

---

**9.** In fact, as noted above, the district court *did* state that the jury could consider the relationship between punitive damages and the defendant's financial condition.

er of fact to consider evidence of defendants' financial worth in considering the appropriateness of punitive awards under California state law claims is accurate.

Therefore, we remand the state law portion of the damages award to the district court for the limited purpose of reconsidering that award in light of *Murakami.* On remand, the district court shall consider evidence as to Officer Searle's financial worth, and determine whether or not a remittitur is appropriate.

## C. *Qualified Immunity Instruction*

■ Defendants next take issue with the district court's refusal to give to the jury a qualified immunity instruction. Police officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In other words, police officers are entitled to assert a qualified immunity defense (and therefore to an instruction) only if they can *affirmatively* show that "their conduct 'was justified by an objectively reasonable belief that it was lawful.'" *Bilbrey v. Brown,* 738 F.2d 1462, 1467 (9th Cir.1984) (quoting *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)).

■ Although it is not particularly clear, defendants' argument seems to be that they were entitled to a qualified immunity instruction because "while the law was clearly established that an officer may not detain an individual without reasonable suspicion it was not firmly established how the principle applied to the entire question concerning airport stops involving potential drug couriers." [10]

We reject this contention. It was well-established at the time of this case that Fourth Amendment seizures occur when a person is not free to leave, and that such seizures must be justified by either probable cause or reasonable suspicion. Defendants offer no reason why we should draw a distinction between stops occurring in airports and those occurring in other places, or any reason why a police officer would believe that citizens' Fourth Amendment rights are somehow diminished in airports. Even if we *were* inclined to analyze as distinct the law of airport/courier stops, our conclusion would remain the same. That law was well developed by the time the events leading to this suit took place— virtually every case the parties discuss in their briefs had been decided several years earlier.

Moreover, the Supreme Court has made clear that in the context of Fourth Amendment violations, there can be no inquiry as to a police officer's *subjective* intent or belief. Rather, only an officer's "*objective* 'good faith'—that is, whether he could reasonably have believed that [his conduct] did not violate the Fourth Amendment—may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983." *Graham v. Connor,* 490 U.S. 386, 399 n. 12, 109 S.Ct. 1865, 1873 n. 12, 104 L.Ed.2d 443 (1989) (emphasis in original). Thus, our conclusion that Officer Searle acted unconstitutionally as a matter of law is the end of our inquiry on qualified immunity. *See, e.g., Kennedy v. Los Angeles Police Dept.,* 901 F.2d 702, 706 (9th Cir.1989) ("Our preceding discussion about the obvious lack of probable cause is dispositive of the qualified immunity question."); *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991) (where police officer had used excessive force in violation of the Fourth Amendment, and relevant law was well established, officer is not entitled to qualified immunity); *cf. Hopkins v. Andaya,* 958 F.2d 881, 885 n. 3 (9th Cir.1992) ("In Fourth Amendment unreasonable force cases, unlike in other cases,

10. Defendants also argue that determinations about qualified immunity are properly the province of the jury. However, there is no question that Judge Pfaelzer was entitled to decide this question as a matter of law. *See Thorsted v. Kelly,* 858 F.2d 571, 575 (9th Cir.1988). In fact, in its latest word on the issue, the Supreme Court has indicated that "Immunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant,* —— U.S. ——, —— ——, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991).

the qualified immunity inquiry is the same as the inquiry made on the merits.").

Defendants do not argue that Searle had an objective "good faith" belief that his actions were constitutional. Nor could such a finding comport with the facts of this case. We note in particular the fact that *Agent Woessner* testified that at the time Morgan turned and walked away from the officers, they did not have reasonable suspicion that would justify detaining Morgan for a brief investigatory stop. In light of that testimony, a claim of objective good faith would be difficult indeed. We find that the facts of this case and our analysis regarding reasonable suspicion preclude a finding that Searle could have objectively believed that his conduct was constitutional. Therefore, we find that the district court did not err in refusing to give a qualified immunity instruction.

## D. *Reputation Testimony*

Defendants next contend that the district court erred in permitting Morgan to put on witnesses who testified as to his reputation. We disagree.

### 1. Standard of Review

■ We review a district court's evidentiary rulings for an abuse of discretion and will not reverse those decisions absent some prejudice to the appealing party. *Roberts v. College of the Desert*, 870 F.2d 1411, 1418 (9th Cir.1988).

### 2. Discussion

■ Before the district court, defendants objected to the admission of evidence as to Morgan's character and reputation on the ground that it was impermissible under Fed.R.Evid.Rule 403 as evidence of prior conduct indicating habit or custom. Defendants argued further that evidence would lead the jury to believe that Morgan would not have acted aggressively against Searle

11. In their opening brief, defendants refer to violations of Rules 404 and 405. However, defendants failed to challenge this testimony on any basis other than Rule 403 before the district court. Therefore, only a challenge on the basis of that rule has been preserved for appeal. *See United States v. Gomez–Norena,* 908 F.2d 497,

that day.[11] Morgan's counsel requested the introduction of this evidence for the purposes of establishing that because Morgan's reputation was so important to him, he suffered a great deal of emotional distress as a result of the unlawful arrest. The district court permitted the testimony, preceding it with the following cautionary instruction:

> The testimony which you are going to hear is not offered to show that Mr. Morgan did or did not act in any particular way on the date and at the time of the incident in question here. It is offered on the issue of damages, the damages that he has been claiming—that he does claim, so let me say it again to you.
>
> It is not offered to show or to convince you that Mr. Morgan did or did not do certain kinds of things on the date and at the time alleged herein but offered instead on the issue of the damages that Mr. Morgan is claiming.

We consider the question whether such evidence should have been admitted to be a fairly close one. The jury may well have been more inclined to believe Morgan rather than Searle once they heard from others about Morgan's integrity and good reputation. However, in civil cases, even the improper admission of evidence is not grounds for granting a new trial unless it constitutes prejudicial error. As discussed above, the jury had plenty of evidence from which to conclude that Searle rather than Morgan was the aggressor. Most important, however, is the probable effect of the district court's cautionary jury instruction and its statement expressly forbidding plaintiff's counsel from implying that such evidence went to habit or custom. We believe that those precautionary steps blunted significantly the impact of this testimony. Therefore, we conclude that the district court did not abuse its discretion in admitting this evidence.

500 (9th Cir.) ("[A] party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, [citations omitted], but also by making the *wrong* specific objection [citations omitted]"), *cert. denied,* —— U.S. ——, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990).

### E. "Juror Irregularities"

Defendants' final argument on appeal is that they are entitled to a new trial because of the following juror "misconduct": 1) after they were excused, some of the jurors told Los Angeles Times reporters that they had "wanted to send a message to City Hall" that police cannot act uncontrollably; and 2) three of the jurors revealed in interviews that the question of whether the damages should cover Morgan's attorney's fees was raised during deliberations, and one juror speculated that his attorney's fees might be around $90,000. Defendants argue that "the injection of such extraneous prejudicial information, and the use of these sorts of influence, to bear upon juror deliberations is improper and arguably falls within the exception to the prohibition contained in Fed.R.Evid.Rule 606(b)."

■ Without conducting an evidentiary hearing on the question, the district court refused to grant a new trial on the basis of this alleged misconduct. We review a district court's refusal to grant a new trial for an abuse of discretion. *Robins v. Harum*, 773 F.2d 1004, 1006 (9th Cir.1985).

■ Defendants offer no legal support for their argument that the sentiments revealed by the jurors constitute a basis for reversing the district court's denial of the motion for a new trial. Nor has our research revealed any. Therefore, we affirm the district court.

The juror's observations about sending messages to City Hall and speculation as to the amount of Morgan's attorney's fees simply do not constitute the sort of "extraneous prejudicial information" that falls within the scope of Fed.R.Evid.Rule 606(b). As we have observed before, "[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room." *Hard v. Burlington Northern R.R. Co.*, 870 F.2d 1454, 1461 (9th Cir.1989). The jury observations complained of here are the type of subjective thoughts and beliefs which are beyond the scope of inquiry in a motion for a new trial on the grounds of juror misconduct.

A party has grounds to seek an evidentiary hearing to determine whether a new trial is necessary because of extrinsic prejudicial information "only when these materials are sufficient on their face to require setting aside the verdict." *Burlington Northern*, 870 F.2d at 1461. For example, in *Burlington Northern*, one juror told the others that he had worked in the same place as the plaintiff, that when he injured himself on the job he'd received paid leave, speculated that defendant railroad company had probably already compensated the plaintiff for his injuries, and brought to the deliberations regarding plaintiff's injuries his independent knowledge of x-ray interpretation. *Burlington Northern*, 870 F.2d at 1458. Although the allegations of juror impropriety made in *Burlington Northern* were far more direct and damaging than those advanced here, the *Burlington Northern* court found no violation of Rule 606(b) or other impropriety sufficient to reverse a trial court's refusal to grant a new trial. *See also Carson v. Polley*, 689 F.2d 562, 579–82 (5th Cir.1982) (juror's speculations as to the weakness of plaintiff's case, the relationship between plaintiff and his attorney and the amount of fees plaintiff paid considered "the subjective thoughts and emotions that may have influenced a juror's deliberations" and therefore not the subject of a trial for a new motion on the basis of juror misconduct.) In light of our past jurisprudence in this area, we have little difficulty affirming the district court's refusal to grant a new trial or hold an evidentiary hearing on the question of juror impropriety.

### CONCLUSION

We AFFIRM the district court with respect to its decisions regarding the grant of JNOV, the question of Officer Searle's entitlement to a qualified immunity instruction, the admission of reputational evidence, and the issue of juror "improprieties." With respect to the federal punitive damages award of $300,000, we GRANT A REMITTITUR and reduce the award to $100,000. Finally, with respect to the state

law punitive damages awards, we RE-MAND to the district court so that it may hear evidence regarding Officer's Searle's financial condition. After considering that evidence, the district court is instructed to determine whether or not to approve the award or grant a remittitur.