**Allene GATES, Plaintiff–Appellant,**

v.

**John RIVERA, Defendant–Appellee.**

No. 91–56484.

United States Court of Appeals,
Ninth Circuit.

Submitted April 8, 1993.*

Decided May 18, 1993.

Stephen Yagman, Yagman & Yagman, Venice, CA, for plaintiff-appellant.

A.J. Pyka, Kinkle, Rodiger and Spriggs, Santa Ana, CA, for defendant-appellee.

---

* The panel unanimously finds this case suitable for submission without oral argument. Fed. R.App.P. 34(a); 9th Cir.R. 34–4.

Before NOONAN, and LEAVY, Circuit Judges, and FITZGERALD **, District Judge.

NOONAN, Circuit Judge:

Allene Gates (Gates) brought a civil rights action under 42 U.S.C. § 1983 against John Rivera (Rivera), a Santa Ana police officer, for using excessive force against her son, Marvin McGensey by intentionally shooting him to death. A jury returned a verdict for Rivera, and judgment was entered in his favor. Finding the evidentiary rulings attacked on appeal to be correct or, in two cases, harmless error, we affirm.

## FACTS

On Sunday, February 6, 1989 Rivera was house-hunting in Riverside, California with his wife, Susan, who was at the wheel of their car. Rivera was a police officer with the Santa Ana Police Department and had served in this capacity for 7 years. He was carrying his service revolver on his left ankle. As they stopped at a red light, Rivera saw a man, later identified as McGensey, jump over a wall protecting a condominium complex.

He continued to watch as McGensey crouched, looked around, and then climbed over another wall into another condominium. Although he was on his day off, Rivera thought a burglary was in progress and decided to investigate. He asked his wife to turn the car around and drive into the driveway of the condominium complex.

Rivera then got out of the car and encountered David Maynor just coming out of his condominium. Maynor, in an excited state, told Rivera that someone had just tried to break into his place by prying open the door to his backyard. Maynor described the man as black and as carrying what could either be a pipe or a weapon. Rivera told Maynor to call the police.

Leaving his wife and the car where they were, Rivera went to an intersection to which he thought the police would come. After a fifteen minute wait during which no officers

appeared, Rivera started back towards Maynor's residence. Before he reached it he saw McGensey on top of a wall. Rivera already had his badge out. He now drew his gun, held it in his right hand, and pointed it at McGensey, telling him "Hold it. You aren't going anywhere." McGensey hesitated a moment and then jumped off the wall out of Rivera's sight.

Again Rivera returned to the intersection, but after a few minutes started back to check on his wife's safety. He began to climb a wooden fence to get a view of the whole condominium complex. As he climbed, he was surprised to find McGensey on the top of the fence. Rivera told him that he was a police officer and to hold it. McGensey said, "I ain't done nothing" and repeated variants of this disclaimer, disregarding Rivera's command to climb down. Instead, he climbed higher. Rivera thought he was getting ready to attack him and said, "Don't do it. Don't be stupid. Get off the wall." McGensey who by then had reached the top of the wall lept down on Rivera. McGensey's left hand reached for Rivera's gun, his right hand went to Rivera's neck. Rivera prevented him from seizing the gun by pulling back from the wall. Both men fell to the ground, then both rose.

Rivera told McGensey that he had done a very stupid thing, that he could have been shot. McGensey again said that he had done nothing. Rivera told him to put his hands behind his back and lie on the ground. McGensey continued to stand, moved his hands underneath his shirt by his pockets, and took a step toward Rivera, who said again, "Don't do it. Just don't to it." McGensey's right hand went into his pants pocket. A moment later, Rivera was hit in the chest by a cigarette lighter which McGensey had hurled at him.

As McGensey was drawing out his hand from his pocket, Rivera was thinking that he "had made a mistake and that he was drawing a gun on me." Rivera knew he was "going to be killed." He was not trained in

** Honorable James M. Fitzgerald, Senior District Judge for the District of Alaska, sitting by desig-     nation.

such a situation to wound an assailant. Believing his own life was "in extreme danger," Rivera discharged his gun, intending to kill McGensey. He did.

The above facts are taken from Rivera's own testimony, confirmed as to the initial stage by the testimony of his wife Susan and Maynor. The only witness to the shooting itself, other than Rivera, was Paul Taylor, a neighbor who happened by and who was presented by the plaintiff as a witness. According to Taylor, he had come on the scene unexpectedly and saw McGensey crouched on the wall with Rivera in front of him with his badge out in his left hand and his gun drawn in his right. Rivera told McGensey, "Come on down off the wall." McGensey responded by "lunging forward at Mr. Rivera. He was more or less attacking." As he lunged forward, Rivera put up his arms, and both men fell to the ground. Both got up. McGensey said, "I didn't do nothing," repeatedly. Rivera told him at least twice to lay down and put his hands over his head. He also said, "Don't be stupid." McGensey and Rivera were three to five feet apart. Taylor thought McGensey might run in his direction and felt threatened by him. McGensey's hands were moving at his waist and around his pockets. Taylor did not see his hands go into his pockets.

Taylor's testimony corroborated Rivera's except that he did not see McGensey put his hand in his right pocket, and he did have the impression that McGensey was about to flee.

Gates, McGensey's mother, testified solely on the issue of damages. She said that her son was a man between 6'1" and 6'2" in height and that he weighed between 200 and 220 pounds. In 1984 he ceased to work and was evidently mentally ill. His appearance shocked her. He didn't keep himself clean, neat and busy as he had used to do. He didn't talk very much. As it turned out, he was suffering from manic depression with suicidal tendencies and from a form of schizophrenia. He went to a psychiatrist, who helped him for a time. He was put on Haldol, with the result that "he would sit and stare into space all day long" and would not talk. Although he improved a little after being switched to Prolixen, "most of the time

he didn't know what he was doing." By this time, 1988, Gates had moved with her son to Riverside and succeeded in getting him into Sunrise Gardens Guest Home, a facility for the mentally retarded. She would visit him every weekend or maybe only once a month, and call him every day. She would take him on Sundays to her congregation of Jehovah's Witnesses, although not often "because a lot of the time he would be in bed and wouldn't feel like going." She would also take him visiting, and shopping, and to the movies. Claire Lowe, the administrator of Sunset Gardens Home, testified that McGensey's "admitting diagnosis was schizophrenia and atypical psychosis with cocaine dependency."

Mark McFall, a detective with the Riverside Police Department, who had investigated McGensey's death, testified that both McGensey's mother and Claire Lowe had told him that McGensey had had a history of drug use. McFall also testified that Rivera when he interrogated him, told him that McGensey was drawing his hand out of his pocket when Rivera fired.

Gates, Maynor, Taylor, Lowe, McFall, Susan Rivera, and John Rivera were the only witnesses to either McGensey's or Rivera's conduct. The toxicologist who had examined McGensey's blood was disqualified as a witness because the chain of custody of the blood could not be established.

A first trial had ended in a mistrial. In the second trial, on the basis of the above testimony, the jury returned a verdict for Rivera and judgment was entered in his favor. Gates appeals.

### ANALYSIS

The sole issues raised on appeal are on evidentiary rulings by the district court. Cumulatively, Gates contends, these errors prejudiced her case. We will review the alleged errors seriatim and then consider the cumulative effect of those rulings found to be erroneous.

■ *First.* Gates contends that she was not allowed to ask Detective McFall whether Taylor had stated at the scene that he had not seen McGensey put his hand in his pocket. Gates argues that this testimony would

have shown that Taylor's in-court testimony to the same effect was not a recent fabrication. This objection is without merit. There was no express or implied charge by Rivera that Taylor's statement was inaccurate or a fabrication of any kind. His prior consistent statement was inadmissable hearsay. Fed. R.Evid. 801(d)(1)(B); *see United States v. Payne,* 944 F.2d 1458, 1470–71 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1598, 118 L.Ed.2d 313 (1992).

■ *Second.* Gates says that the cigarette lighter thrown by McGensey should not have been admitted into evidence. The basis for this objection is not articulated. The sufficiency of the authentication of the lighter rested in the sound discretion of the district court. *United States v. Spetz,* 721 F.2d 1457, 1476 (9th Cir.1983). We have no basis for holding that its discretion was erroneously exercised.

*Third.* Gates challenges the admission into evidence of a hand-drawn diagram of the scene, "notwithstanding that there was no foundation for its introduction" and that in fact it gave "an inaccurate perspective." The record does not show that the diagram was admitted into evidence.

The above allegations of error we discard. We turn to two more serious contentions:

*First.* Over Gates's objection as to relevancy, Rivera was permitted to testify that in his sixteen and one-half years as a police officer, he had not shot anyone. Without objection he was permitted to testify that he had never before discharged his weapon. These statements by Rivera were referred to by defense counsel in argument to the jury.

■ Gates' objections should have been sustained. Fed.R.Evid. 404. Character evidence is normally not admissible in a civil rights case. *Cohn v. Papke,* 655 F.2d 191, 193 (9th Cir.1981). By Rivera's own admission, intent was not an issue. The question to be resolved was whether, objectively, his use of force had been excessive. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). His past conduct did not bear on that issue.

■ *Second.* Over Gates's objection McFall was asked what Gates had told him about her son's drug usage and answered that she said, "He had a history of drug use, including the usage of marijuana and cocaine, primarily." This questioning followed Rivera's cross-examination of Gates where the court ruled that, because her testimony was solely on the issue of damages and focused on the kind of son she had lost, she might be asked if her son had had any problem with drugs and if she had told McFall that her son had had a problem with marijuana and cocaine. Gates answered both these questions negatively. The question to McFall was in rebuttal.

Restricted to the issue of damages, the questions as to McGensey's use of drugs were proper, and the district court had discretion to admit them as probative and not unduly prejudicial. It is difficult to see that they could have been harmful when Claire Lowe testified, without objection, that McGensey's diagnosis included "cocaine dependency."

■ We are left with the one question about Rivera's past conduct that was objected to and the one question as to his past conduct that might have been objected to, both of which were irrelevant. Were they harmless? In answering this question we must undertake a review of the trial as a whole and look at the case as it would have stood if Rivera's answers had not been in evidence. *See Morgan v. Woessner,* 975 F.2d 629, 644 (9th Cir.1992). Necessarily, this kind of appellate exercise is hypothetical, but to the extent that we can we must ascertain the likelihood that these particular jurors in this particular case were influenced in their verdict by the improperly-admitted answers. *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983).

■ The confrontation between Rivera and McGensey was described in almost the same terms by the plaintiff's witness Taylor and by Rivera himself. The only details of difference—arguably critical—were whether McGensey seemed poised to flee and McGensey's hand was withdrawing something from his pocket. Rivera's testimony on these points was corroborated by the cigarette lighter. His self-serving testimony about his

past conduct with guns did not enhance his credibility. Admittedly Rivera shot to kill. The jury either believed what he said about the threat McGensey posed or they did not. Evidently they believed him. No likelihood exists that the inadmissible answers affected the verdict.

AFFIRMED.