SECURITY FARMS; El Dorado Farms; Manriquez & Acuna, Inc.; Higashi Farms, Inc.; Pisoni Farms, a California Corporation, Plaintiffs–Appellants,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFERS, WAREHOUSEMEN & HELPERS, an Unincorporated Association, Defendant–Appellee.

SECURITY FARMS; El Dorado Farms; Manriquez & Acuna, Inc.; Higashi Farms, Inc.; Pisoni Farms, a California Corporation, Plaintiffs–Appellees–Cross–Appellants,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFERS, WAREHOUSEMEN & HELPERS, an Unincorporated Association, Defendant–Appellant–Cross–Appellee.

SECURITY FARMS; El Dorado Farms; Manriquez & Acuna, Inc.; Higashi Farms, Inc.; Pisoni Farms, a California Corporation, Plaintiffs–Appellants,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFERS, WAREHOUSEMEN & HELPERS, an Unincorporated Association, Defendant,

and

Teamsters Joint Council No. 7, Defendant–Appellee.

In re: GENERAL TEAMSTERS, WAREHOUSEMEN AND HELPERS UNION LOCAL 890, Debtor, Debtor–in–Possession,

Security Farms; El Dorado Farms; Manriquez & Acuna, Inc.; Higashi Farms, Inc.; Pisoni Farms, a California Corporation, Freitas Farms; San Ysidro Farms, Plaintiffs–Appellees,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFERS, WAREHOUSEMEN & HELPERS, an Unincorporated Association, Defendant,

and

**1000**

General Teamsters, Warehousemen
and Helpers Union Local 890,
Defendant–Appellant.

SECURITY FARMS; El Dorado Farms;
Manriquez & Acuna, Inc.; Higashi
Farms, Inc.; Pisoni Farms, a California
Corporation, Freitas Farms; San Ysidro
Farms, Plaintiffs–Appellants,

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFERS, WARE-
HOUSEMEN & HELPERS, an Unincor-
porated Association, Defendant,

and

General Teamsters, Warehousemen
and Helpers Union Local 890,
Defendant–Appellee.

SECURITY FARMS; El Dorado Farms;
Manriquez & Acuna, Inc.; Higashi
Farms, Inc.; Pisoni Farms, a California
Corporation, Freitas Farms; San Ysidro
Farms, Plaintiffs–Appellees,

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFERS, WARE-
HOUSEMEN & HELPERS, an Unincor-
porated Association, Defendant–Appel-
lant.

SECURITY FARMS; El Dorado Farms;
Manriquez & Acuna, Inc.; Higashi
Farms, Inc.; Pisoni Farms, a California
Corporation, Plaintiffs–Appellees–
Cross–Appellants,

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFERS, WARE-
HOUSEMEN & HELPERS, an Unincor-
porated Association, Defendant–Appel-
lant–Cross–Appellee,

and

General Teamsters, Warehousemen
and Helpers Union Local 890,
Debtor–Appellee.

Nos. 95–15171, 95–15237, 95–15296,
96–15563, 96–15648, 96–15649
and 96–15686.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 1997.

Decided Aug. 22, 1997.

David G. Finkle, Los Angeles, CA, Charley M. Stoll, Camarillo, CA, for plaintiffs-appellees-cross-appellants.

Christian L. Raisner, Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, CA, Duane B. Beeson, Robert Bonsall, Kathleen A. Murray, Beeson, Tayer & Bodine, for defendants-appellants-cross-appellees.

Before: SNEED and KLEINFELD, Circuit Judges, and WALLACH,[*] International Trade Judge.

SNEED, Circuit Judge:

This opinion springs from controversies possible only in a highly specialized, vertically integrated industry, heavily dependent on relatively low skilled agricultural workers, whom a strong international union seeks to organize, and in which each major party is more than amply represented by members of the legal profession. The opinion thus reflects both the soil of California and the intense competitiveness of its people.

This case involves three defendants and three separate but related appeals. The appeals derive from Security Farms' and other agricultural growers' ("Growers")[1] request

---

[*] Honorable Evan J. Wallach, Judge, United States Court of International Trade, sitting by designation.

1. In addition to Security Farms, plaintiffs to this action include H.Y. Minami, El Dorado Farms, Higashi Farms, Inc., Pisoni Farms, Inc., Joe Freitas & Sons, Freitas Farms, San Ysidro

for damages for losses suffered by Growers in 1989 during a strike by General Teamsters, Warehousemen and Helpers Union, Local 890 ("Local 890"), against Bud Antle, Inc. ("Bud Antle"), a contractor of labor harvesting crops in California. Growers also seek to recover damages from the Local's parent union, the International Brotherhood of Teamsters ("the International"), and an intermediate union within the International's structure, Joint Council No. 7 ("the Joint Council").

## I.

## BACKGROUND AND PROCEDURAL HISTORY

Bud Antle is a vertically integrated company which harvests, packs, markets, and ships California produce. It gets its produce from various growers throughout California, who own the land and grow the crop. To harvest and pack the growers' crops, Bud Antle is dependent on thousands of laborers represented by Local 890.

Prior to the strike, Local 890 found itself in financial disarray. The Local's internal problems undermined its ability to administer and enforce its collective bargaining agreements. Its failures regarding the Bud Antle agreement inspired some Local 890 members to file a petition to decertify the union. This petition, the threat of others like it, and the fact that Local 890 was in arrears on regular payments due the International spurred the parent union to action. It considered but rejected placing Local 890 in trusteeship. Instead, in May 1989, the International's General President appointed Alejandro Ybarrolaza to oversee the Local in its daily functions, particularly its financial affairs.[2] Ybarrolaza had complete access to the Local's financial records. Moreover, he took a lead role in the representation of Union members and the negotiation of Local 890's collective bargaining agreements.

In the summer of 1989, Ybarrolaza participated in lengthy unsuccessful negotiations with Bud Antle. Toward the end of the 1989 summer, the employees represented by Local 890 voted down Bud Antle's final proposal for a new collective bargaining agreement. On September 11, 1989, the Joint Council granted Local 890's request for strike sanctions and on October 26, 1989 the strike commenced. Although Growers were not a party to the collective bargaining agreement, Local 890 members picketed Growers' fields.

### A. The Strike

More than two thousand workers participated in the strike against Bud Antle. Local 890 established a chain of command whereby picket captains acted as liaisons between the picketers and Local 890's business agents. Picket captains lacked the authority to designate strike locations without the approval of a business agent, but were responsible for implementing the latter's instructions regarding strike activity.

On October 26, 1989, Bud Antle's union employees left the fields where they were harvesting and reported to Bud Antle's offices and cooler facilities—strike areas previously designated by Local 890 officials. Initially, Local 890 officials thought that field picketing would be unnecessary and Ybarrolaza advised them against it. Moreover, in the early stages of the strike, the business agents instructed both picket captains and picketers to strike peacefully, without violence, and to not "do anything that would create any problems." However, Growers provided testimony and documentary evidence at trial which, despite the Union's early intentions, portrayed a violent strike not only tolerated but at times inspired by Local 890 officials.

Frank Gallegos, President of Local 890, was arrested by state police for impeding the entrance to a Bud Antle facility in Salinas and for resisting arrest. Arrests of other union officials followed. Teresa Escamilla, a picket captain, rushed into the fields owned by Growers, a technique used to intimidate replacement workers, and was arrested.

---

Farms, J.J.C., Inc. and labor contractor Manriquez & Acuna.

**2.** Ybarrolaza replaced John Blake, the International's original appointee, because of Blake's inability to speak Spanish.

Arturo Castro, a business agent, conceded that field picketing occurred but maintained that he did not authorize it. However, a fellow business agent testified at trial that Castro himself entered a field on one occasion with the intent of confronting a nonstriking worker. In any event, Castro was present during many of the violent outbreaks. Although the Union knew of Castro's presence in the fields, it never removed him from his post nor disciplined him in any way. Likewise, Escamilla, despite her disobedience, maintained her position as a picket captain and her place on the negotiating committee.

Ybarrolaza, on the other hand, did not picket during the strike and, to repeat, did advise the Local against the practice of field picketing. He also participated in negotiations to end the strike and reported to the International and the Joint Council on the status of the strike and the negotiations.

## B. *The Lawsuit*

Growers turned to the state courts for relief, filing a series of lawsuits alleging only state law violations by Local 890 for the actions of its picketers. On August 13, 1990, Local 890 filed a voluntary petition under Chapter 11 of the Bankruptcy Code which automatically stayed the pending state court actions. Growers then amended their complaints to substitute the International and the Joint Council for "Doe" defendants on the basis of the organizations' participation in the Bud Antle strike. Two years and several hearings later, the bankruptcy court lifted the automatic stay and Growers coordinated the many state lawsuits into one action, *Teamsters Labor Dispute II*, Judicial Council Coordination Proceeding No. 2650.

The International was not content; several procedural skirmishes ensued. On February 12, 1993, the International removed the coordinated proceeding to federal court pursuant to 28 U.S.C. § 1452(a), where it was automatically referred to the bankruptcy court. The International resisted the referral and on February 18, 1993, filed a motion to withdraw the reference from the bankruptcy court. Meanwhile, the bankruptcy court issued an order remanding the case back to

state court. That order was stayed by the federal district court pending a decision on the motion to withdraw the reference. That court, Judge Orrick presiding, subsequently granted the motion. The Growers responded with unsuccessful efforts to challenge the district court's decision. First, the Growers failed to obtain certification of an interlocutory appeal under 28 U.S.C. § 1292(b); and second, they failed to convince this court to grant their petition for a writ of mandamus directing Judge Orrick to rescind the withdrawal of the reference, or to take other action restoring the state proceedings. Undeterred, Growers then moved for a change of venue and for abstention in favor of state court. Judge Orrick granted the request to transfer venue but did not decide the motion to abstain. He then transferred the proceeding to District Judge Ware in San Jose where Growers renewed their abstention motion. Judge Ware denied abstention, reasoning that the application of federal labor laws was necessary to the resolution of the dispute.

Thereafter, the International moved for summary judgment and for sanctions against Growers' counsel. The Joint Council also moved for summary judgment and, alternatively, for partial judgment on the pleadings. Local 890 moved for judgment on the pleadings with respect to Growers' cause-of-action for negligent supervision. On June 16, 1994, Judge Ware ordered summary judgment in favor of the International and the Joint Council, but denied Local 890's motion for judgment on the pleadings. Judge Ware initially denied a motion for sanctions against the Growers' counsel, but later reopened the matter and issued an order imposing such sanction. Months later, following Growers' bench trial against Local 890, Judge Ware found the Local liable for strike misconduct pursuant to section 6 of the Norris–LaGuardia Act, 29 U.S.C. § 106. Timely appeals and cross-appeals followed.

## C. *The Appeals*

On appeal, Growers contest (1) Judge Orrick's decision to *withdraw the reference* of this case from the bankruptcy court, (2) Judge Ware's decision *not to abstain* in favor

of state court, and (3) Judge Ware's grant of summary judgment in favor of the International and the Joint Council. Local 890 appeals, and Growers cross-appeal, the judgment against Local 890 for strike misconduct and the resulting damage award. Finally, the International appeals, and Growers' counsel cross-appeal, Judge Ware's order imposing sanctions against Growers' counsel for submitting improper declarations. We affirm in all respects save one. We remand for clarification the district court's judgment against Local 890, and its award of damages.

## II.

### PROCEDURAL ISSUES

We turn first to the procedural issues raised by the retention of this action in federal district court.

These issues have their source in the difference between the applicable standards of proof. Section 6 of the Norris–LaGuardia Act applies to the *federal* adjudication of state tort claims arising out of labor disputes. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 737, 86 S.Ct. 1130, 1144–45, 16 L.Ed.2d 218 (1966). It requires "clear proof of actual participation in, or actual authorization of" the unlawful activity. 29 U.S.C. § 106 (1994). While some states have taken the position that section 6 of the Norris–LaGuardia Act applies to *state* court adjudications of these claims, *see, e.g., Hiestand v. Amalgamated Meatcutters, etc.,* 233 Kan. 759, 666 P.2d 671 (1983); *Sowels v. Laborers' Int'l Union of N. Am.,* 112 Mich.App. 616, 317 N.W.2d 195 (1981); *Melancon v. United Ass'n of Journeymen,* 386 So.2d 669 (La.App.1980), *writ refused* 387 So.2d 596 (La.1980), Califor-

nia has not. Rather, California has specifically rejected the notion that section 6 applies in its courts' adjudication of purely state law claims. *See J.R. Norton Co. v. Gen. Teamsters Local 890,* 208 Cal.App.3d 430, 256 Cal.Rptr. 246, 253–54 (1989) (determining the Union's liability on the basis of state agency law). Not surprisingly, the Growers—favoring the ordinary preponderance of the evidence standard—contend that this entire controversy should be litigated in California courts. The Union, equally unsurprisingly, prefers a federal venue.

### A. *Withdrawal of the Reference*

The bankruptcy court's order remanding the state claims back to state court, to repeat, was stayed and eventually nullified by the district court's order withdrawing the reference from the bankruptcy court. The court determined that withdrawal was mandatory because, despite the Growers' state law causes of action, resolution of the consolidated cases required substantial and material consideration of federal law. Alternatively, if withdrawal was not mandatory, the district court exercised its discretion to grant permissive withdrawal because it was "the most appropriate forum for the resolution of these cases." Growers contend that the court abused its discretion by withdrawing the reference due to the lack of material federal issues presented by their state law allegations.[3] Moreover, the Growers argue that withdrawing the reference in this case encouraged forum shopping by rewarding defendants' efforts to avail themselves of the more stringent federal standard of proof.

---

**3.** Aside from the merits of the district court's decision, Growers also argue that the International's motion to withdraw was untimely. A motion to withdraw is timely "if it was made as promptly as possible in light of the developments in the bankruptcy proceeding." *In re Baldwin–United Corp.,* 57 B.R. 751, 754 (S.D.Ohio 1985). The International filed its motion to withdraw the reference six days after the coordinated proceeding was removed to the district court and automatically referred to the bankruptcy court. Growers claim that the International could have moved to withdraw the reference from the day it and the Joint Council were substituted for "Doe" defendants, almost two years earlier. We dis-

agree. The International could not remove the state court proceeding until the bankruptcy court officially lifted the automatic stay. As a practical matter, there may not have been a basis for withdrawal prior to the removal. Furthermore, any action taken by the International to withdraw the reference prior to the lifting of the automatic stay would have risked sanctions and damages for violation of the stay under 11 U.S.C. § 362(h). *See* 11 U.S.C. § 362(h) (1994); *In re Bloom,* 875 F.2d 224, 226 (9th Cir.1989) (holding that a motion to withdraw the reference violated § 362). Accordingly, the district court did not abuse its discretion by determining that the motion was timely.

*1. Jurisdiction and Standard of Review*

 We have jurisdiction over Growers' appeal from the order withdrawing the reference from the bankruptcy court under 28 U.S.C. § 1291. An order to withdraw the reference is interlocutory. However, "the rule in this circuit [is] that once a final judgment is entered, an appeal from an order that would otherwise be interlocutory is then appealable." *In re Eastport Associates,* 935 F.2d 1071, 1075 (9th Cir.1991). "There is no danger of piecemeal appeal confronting us if we find jurisdiction here, for nothing else remains in the federal courts." *Id.* (quoting *Anderson v. Allstate Insurance Co.,* 630 F.2d 677 (9th Cir.1980)). We review a district court's decision to withdraw the reference for an abuse of discretion. *See In re Cinematronics, Inc.,* 916 F.2d 1444, 1451 (9th Cir. 1990).

*2. Permissive Withdrawal of the Reference*

 To understand this issue, a bit of history is necessary. In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court held that the Bankruptcy Act of 1978 impermissibly shifted essential attributes of judicial power from the Article III district court to its non-Article III adjunct, the bankruptcy court. Congress responded by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, which provided district courts with original but not exclusive jurisdiction over all bankruptcy proceedings. *See* 28 U.S.C. § 1334(b) (1994). Moreover, to insulate the 1984 Amendments from a constitutional assault like that in *Marathon,* Congress enacted 28 U.S.C. § 157. That section classifies matters as either "core proceedings," in which the bankruptcy court "may enter appropriate orders and judgments," or "non-core proceedings," which the bankruptcy court may hear but for which it may only submit proposed findings of fact and conclusions of law to the district court for *de novo* review. 28 U.S.C. § 157 (1994). Actions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered "non-core." *See In re Castlerock Properties,* 781 F.2d 159, 162 (9th Cir.1986).

 Section 157 also governs the district court's authority to withdraw the reference and, consistent with the *Marathon* decision, *mandates* withdrawal in cases requiring material consideration of non-bankruptcy federal law. *See* 28 U.S.C. § 157(d).[4] The district court's authority for *permissive* withdrawal is governed by the first sentence of 28 U.S.C. § 157(d): "The district court *may* withdraw ... any case or proceeding referred [to the bankruptcy court] on its motion or on timely motion of a party, *for cause shown.*" 28 U.S.C. § 157(d) (emphasis added). In determining whether cause exists, a district court should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors. *See In re Orion Pictures Corp.,* 4 F.3d 1095, 1101 (2d Cir. 1993).

 In this case efficiency was enhanced by withdrawing the reference because non-core issues predominate. The Growers' state law claims did not depend on Title 11, *see In re Castlerock Properties,* 781 F.2d at 162, but were in federal court only because of their potential impact on the administration of Local 890's estate.[5] They

---

**4.** By contrast, permissive withdrawal does not hinge on the presence of substantial and material questions of federal law.

**5.** We note here that the district court did have subject matter jurisdiction over this dispute. We are, of course, as with any federal court, obliged to notice want of subject matter jurisdiction. *See Things Remembered, Inc. v. Petrarca,* —— U.S. ——, ——, 116 S.Ct. 494, 499, 133 L.Ed.2d 461 (1995) (Ginsburg, J., concurring). Growers' action against Local 890, a debtor in bankruptcy, satisfies the relatively facile requirement of being "related to" a case arising under Title 11. *See* 28 U.S.C. § 1334(a) (1994); *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984). While only tenuously connected to Local 890's estate, Growers' claims against the International and the Joint Council come within the broad grant of supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) (1994) (authorizing the grant of supplemental jurisdiction over any claim "so related" to the action within the district court's original jurisdiction "that they form part of the same case or controversy").

were non-core. Inasmuch as a bankruptcy court's determinations on non-core matters are subject to *de novo* review by the district court, unnecessary costs could be avoided by a single proceeding in the district court. *See id.; In re Mann*, 907 F.2d 923, 926 (9th Cir.1990). Furthermore, we reject the Growers' claim that the district court's decision encourages forum shopping. Growers' argument misstates the effect of the district court's decision to withdraw the reference. Without regard to withdrawal, the bankruptcy court's order remanding Growers' non-core, state law claims inevitably was subject to the approval of the district court. *See* 28 U.S.C. § 157(c)(1). Thus, Growers' real complaint is not with the withdrawal of the reference, but with Judge Orrick's implicit rejection of the bankruptcy court's remand of the Growers' case to the state court [6]—an issue not raised by this appeal and, in any event, not reviewable by this court.[7] Consequently, the district court's decision to withdraw the reference from the bankruptcy court did not amount to an abuse of discretion.[8]

B. *Denial of Motion to Abstain As a Decision Not to Remand*

Relying on the conclusions reached by Judge Orrick in his order withdrawing the reference, Judge Ware, now presiding because of the venue change, summarily denied Growers' motion to abstain.

6. In the district court's order withdrawing the reference, it denied Growers' request for a hearing on the issue of remand. Judge Orrick stated: "Because the Court finds that the issues in the adversary proceeding involve federal law substantially and materially ... it denies the request."

7. Excluding an inquiry into the district court's subject matter jurisdiction, we may not review its decision not to remand. *See* 28 U.S.C. § 1452(b) (1994). To the extent that Growers' appeal from the district court's withdrawal of the reference is really an appeal from its decision not to remand, we are without jurisdiction to review that decision. Section 1452(b) prevents this court from reviewing a district court's decision not to remand. *See* section II.B.1., *infra*.

8. Because Judge Orrick properly exercised his discretion in withdrawing the reference, we need not address whether withdrawal of the reference was mandatory in this case.

Abstention is governed by 28 U.S.C. § 1334(c) and, like withdrawal of the reference, can be either permissive or mandatory. Section 1334(c)(1) provides for permissive abstention in both core and non-core proceedings while the mandate to abstain contained in section 1334(c)(2) applies only to actions merely "related to" a bankruptcy case. Without reaching the merits of Judge Ware's decision not to abstain, we hold that the abstention provisions are inapplicable to this case. Moreover, to the extent that we are required to construe Growers' motion to abstain as a motion to remand, we note again that we lack appellate jurisdiction to review the district court's decision not to remand.

*1. Jurisdiction*

■■■ Abstention can exist only where there is a parallel proceeding in state court. That is, inherent in the concept of abstention is the presence of a pendant state action in favor of which the federal court must, or may, abstain. *See, e.g., In re S.G. Phillips Constrs., Inc.*, 45 F.3d 702, 708 (2d Cir.1995) (including as a requirement for mandatory abstention the presence of a previously commenced state action); *In re Tucson Estates*, 912 F.2d 1162, 1167 (9th Cir.1990) (recognizing as a factor for permissive abstention the presence of a related proceeding commenced in state court or other nonbankruptcy court).[9]

9. The version of 28 U.S.C. § 1334(c) in effect at the time Local 890 filed its petition for bankruptcy, stated in part:

(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11. (c)(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction. *Any decision to abstain or not to abstain made under this subsection is not reviewable by appeal or otherwise by the court of appeal.*

To require a pendant state action as a condition of abstention eliminates any confusion with 28 U.S.C. § 1452(b), which provides district courts with the authority to remand civil actions properly removed to federal court, in situations where there is no parallel proceeding. Section 1334(c) abstention should be read in *pari materia* with section 1452(b) remand, so that the former applies only in those cases in which there is a related proceeding that either permits abstention in the interest of comity, section 1334(c)(1), or that, by legislative mandate, requires it, section 1334(c)(2).

■ The International extinguished the coordinated state proceeding on February 12, 1993 when it successfully removed this case to federal court. No other related proceeding thereafter exists.[10] To avoid confusion and to protect against the inconsistent application of the law, we treat the denial of abstention in this case as a decision not to remand, which we cannot review because of 28 U.S.C. § 1452(b).

■ The International *removed* this action to federal court pursuant to 28 U.S.C. § 1452(a), the Bankruptcy Code's analog to the general statutory provision governing removal, 28 U.S.C. § 1441. Thus, a decision *not to remand* this case comes within the proscriptive language of section 1452(b), which provides in relevant part:

> An order entered under this subsection remanding a claim or cause of action, or a decision not to remand, *is not reviewable*

by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title....

(Emphasis added). *See also Things Remembered,* — U.S. at —, 116 S.Ct. at 499 (Ginsburg, J., concurring) ("... [28 U.S.C.] § 1452(b) independently warrants the judgment that remand orders in bankruptcy cases are not reviewable"). The purpose of section 1452 is to enlarge a trial court's power to remove or remand a claim related to a bankruptcy case. *See Things Remembered,* — U.S. at —, 116 S.Ct. at 499 (Ginsburg, J., concurring). Section 1452(b) therefore bars our exercise of appellate jurisdiction over this aspect of Growers' appeal.

### III.

### MERITS

**A. Growers' Claims Against the International Brotherhood of Teamsters and Joint Council No. 7**

In February 1994, after the Growers had exhausted their efforts to return this case to state court, the International moved for summary judgment. In March 1994, the Joint Council also so moved.[11] The district court combined the motions for joint consideration and granted summary judgment in favor of the International and the Joint Council on all claims made by Growers. Growers now appeal the district court's grant of summary judgment. We have jurisdiction and affirm.

---

(Emphasis added.)

Congress has since amended § 1334 by redesignating the portion of § 1334(c)(2) beginning "any decision to abstain" as § 1334(d) and adding additional language. The new § 1334(d) provides for appellate review of a trial court's denial of mandatory abstention. The legislative history of the amendment indicates that Congress viewed this change as carving out a narrow exception to a general rule prohibiting appellate review of abstention decisions. *See* H.R.Rep. No. 103–835, 103d Cong., 2d Sess. (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3345–46 ("Any future decisions not to abstain, if made in cases filed before the effective date of the Act, would [ ] be governed by present law and thus would not be appealable to the Circuit Court of Appeals.") Section 1334(d) would not apply to this case because Local 890 filed its petition prior to the effective date of the amending legis-

lation. *See* The Bankruptcy Reform Act of 1994, Pub.L.No. 103–394, § 702(b) (1994). Nevertheless, were abstention the appropriate vehicle for Growers' concerns, the 1994 amendments would undoubtedly impact our ability to review an order to abstain or not to abstain.

**10.** The dilemma, as summarized by a Texas bankruptcy court, is inescapable: "If [the] Court were to abstain, nothing would happen because there is only one lawsuit. What movant really seeks is remand ... back to State Court." *In re Duval County Ranch Co.,* 167 B.R. 848, 849 (Bkrtcy.S.D.Tex.1994).

**11.** Alternatively, the Joint Council moved for partial judgment on the pleadings. The district court did not reach the Joint Council's alternative motion and neither do we.

### 1. Authentication of the "Smoking–Gun" Declarations

■ As a preliminary matter, Growers argue that the district court erred by refusing to consider certain declarations presented by Growers on the basis that they were not properly authenticated. The submission of the declarations at issue, the "smoking-gun" declarations, ultimately resulted in the sanctioning of Growers' counsel. Nonetheless, Growers contend that the district court should not have sustained the International's objection to them at the motion for summary judgment.

■ We review a district court's evidentiary rulings for an abuse of discretion. See United States v. Sarno, 73 F.3d 1470, 1488 (9th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996). The standard governing admissibility is as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a).

■ The International provided the district court with sworn deposition testimony of the declarants which contradicted significant portions of the declarations, undermining the authenticity of the evidence. In addition, the International successfully cast doubt upon the credibility of Victor Vidal, a private investigator and translator hired by Growers. Vidal swore under penalty of perjury that he was fluent in both Spanish and English and that he had translated the declarations from English to Spanish before the declarants, who understood only Spanish, signed them. However, the International's deposition of Vidal, during which he was forced to request the assistance of an interpreter, suggested that he was not fluent in Spanish. Vidal's need for an interpreter significantly called into question the reliability of the declarations. The sufficiency of authentication rests in the sound discretion of the district court. See Gates v. Rivera, 993 F.2d 697, 700 (9th Cir.1993). We see no basis for holding that it erroneously exercised such discretion here.

### 2. Review of Summary Judgment Against Growers

■ The proper litany is that we review a grant of summary judgment de novo. See Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). Moreover, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the relevant substantive law was correctly applied. See id.

■ To avoid summary judgment, Growers were required to present evidence such that a reasonable trier-of-fact could return a verdict in their favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Such evidence is to be measured against the substantive evidentiary standard of proof applicable at trial. See id. at 254, 106 S.Ct. at 2513. As previously discussed, the applicable standard of proof in this case is provided by section 6 of the Norris–LaGuardia Act, 29 U.S.C. § 106, which provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon *clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.*

(Emphasis added). The Supreme Court has equated "clear proof" with standards such as "clear, unequivocal and convincing proof." Gibbs, 383 U.S. at 737, 86 S.Ct. at 1145.

#### a. Role of the International's Representative Ybarrolaza

The Growers' case against the International and the Joint Council rests substantially on the significance properly attributable to the International's appointment of Ybarrolaza to oversee the operations of Local 890 and his actions thereafter.[12] They argue that:

---

12. Growers alleged, inter alia, that the International and the Joint Council participated in or authorized: (1) physical obstruction of the entrances to Growers' fields; (2) intimidation of

(1) The scope and influence of Ybarrolaza's involvement with the Local was such that the International and the Joint Council assumed de facto control over Local 890; (2) Ybarrolaza had knowledge of the unlawful strike activity, but did not intervene; and (3) Ybarrolaza was present during strike functions wherein Local 890 officials advocated the use of force.

### (1) Did The International and The Joint Council "Control" the Local?

The Growers' first theory of liability does not rest on Ybarrolaza's actual participation in or authorization of the illegal activity. Instead, they attempt to demonstrate that his involvement with Local 890 was sufficient to support a finding, based on clear and convincing proof, that the International and the Joint Council "controlled" the Local.[13]

At summary judgment, Growers supplied documentary evidence and deposition testimony which established that Ybarrolaza had full access to Local 890 business records, that he maintained an office at Local 890 headquarters, and that he was expected to, and did, take a lead role in the negotiation of the Local's collective bargaining agreements. None of this is disputed by the defendants. In fact, all parties agree on the extent of Ybarrolaza's involvement in the daily operations of Local 890. They disagree only about that which reasonably can be inferred from Ybarrolaza's role. The International and the Joint Council insist that Ybarrolaza merely assisted the Local in carrying out its functions as a collective bargaining representative. Growers argue that Ybarrolaza's involvement supports the inference that defendants "controlled" the actions of Local 890.

The Growers' conclusion is not supported by the facts. Despite increasing dissatisfaction with Local 890's performance, the International chose not to place it in trusteeship. It selected a lesser mode of involvement. The International appointed Ybarrolaza *to supervise* the Local in the administration of its affairs.[14] In effect, Growers contend, despite the stated purpose of Ybarrolaza's appointment, that Ybarrolaza's relationship with Local 890 was that of *a de facto trustee*. We disagree. Growers provide no evidence that Ybarrolaza exercised control or even influence over the strike policy of the Local. What Growers can demonstrate is that Ybarrolaza participated in negotiations, assisted with the implementation of austerity measures, and reported to McCarthy on the status of the Local's progress.[15] In short, they

nonstriking workers; (3) acts of violence; (4) vandalism of equipment belonging to Growers; and (5) acts in violation of California Civil Code §§ 51.7 and 52.

13. Norris–LaGuardia requires more than is required under ordinary doctrines of common-law agency. *See Gibbs*, 383 U.S. at 736, 86 S.Ct. at 1144. Under Growers' line of analysis, Local 890 would, in effect, merge into the International or the Joint Council. Thus, the key ingredient for the International's or the Joint Council's liability would be that, through the conduct of Ybarrolaza, it assumed *control* over the situation. This accords with section 6 of Norris–LaGuardia which was designed to protect unions from liability "for damages done by acts beyond their practical *control*." *Gibbs*, 383 U.S. at 737, 86 S.Ct. at 1144.

14. In a letter dated April 11, 1989, McCarthy notified the Local of John Blake's appointment, the International's original representative. McCarthy described the role of the appointee in the letter, which stated in part:

Brother Blake will be in contact with the Local Union and must have complete access to all Local Union financial records, contracts and applicable documents. As previously stated, the purpose of his assignment is to supervise the administrative affairs of the Local on my behalf and as such, this is not to be considered the equivalent of a trusteeship. Your Local Union will continue to have complete Local autonomy, but all matters concerning the operation of the Local Union must be brought before Brother Blake before they are implemented.

15. We accept Growers assertion that Ybarrolaza's mission to steady the wayward Local was important to the International. The International has a vested interest in operationally sound and financially stable local chapters. Local 890 is both a constituent and a representative of the International Brotherhood of Teamsters. Its health and the International's are inextricably linked. However, the importance of Ybarrolaza's appointment to the International does not alone foster the inference that it or the Joint Council had assumed control over the Local, particularly in light of the International's decision not to place Local 890 in trusteeship.

fail to create a triable issue of fact that the International or the Joint Council controlled the Local. *See Rodonich v. House Wreckers Union Local 95,* 817 F.2d 967, 974 (2d Cir. 1987) (noting the well-settled rule that the exercise of supervisory powers is on its own insufficient to render an affiliate union the agent of the international). Thus, Ybarrolaza's appointment did not expose the International and the Joint Council to liability.

Our conclusion is not weakened by the Growers' subsequent presentation of evidence, in the lawsuit against Local 890, demonstrating that Ybarrolaza *lacked* control over the actions of the Local. In the bench trial against Local 890, Growers put into evidence deposition testimony indicating that Ybarrolaza "repeatedly admonished" Local 890 officials not to picket Growers' fields, and to reduce the number of picketers, "but to no avail."

(2) *The International's and The Joint Council's Knowledge of Strike Misconduct*

 Growers also argue that, through Ybarrolaza, the International had knowledge of the illegal activities. Norris–LaGuardia, however, requires more than knowledge of the unlawful activity. *See* 29 U.S.C. § 106. It requires either participation, or authorization of the illegal acts, or ratification of such acts in addition to "actual knowledge thereof." *See id.* Thus, Growers' ability to establish that the International and the Joint Council had knowledge of the strike misconduct, without more, does not demonstrate liability on the part of the International or the Joint Council.[16] Nor does Ybarrolaza's continued involvement as an advisor to the Local and in the negotiations to end the strike amount to ratification of the unlawful acts. *See Gibbs,* 383 U.S. at 738–39, 86 S.Ct. at 1145–46 (requiring for ratification proof that the union approved of the violence). Finally, Growers contend that Ybarrolaza was present when the use of force was advocated by Local 890 officials. We have examined the record and find no support for this contention. We therefore affirm the grant of summary judgment.

B. *Review of Bench Trial Judgment Against Local 890*

Following a bench trial, the district court found that Local 890 was an active participant in conduct which caused damages to Growers. The Local appeals the court's judgment. It contends that the court erred in its interpretation of section 6 of the Norris–LaGuardia Act, and that the evidence produced at trial did not rise to Norris–LaGuardia's requirement of *clear proof.* Growers cross-appeal the court's determination of the damage award. We uphold the district court's finding of liability, but remand on the issue of damages for the limited purpose of determining whether, and to what extent, the district court based the Union's liability on California Civil Code § 51.7.

1. *Application of Section 6*

The district court found "clear evidence that conduct in which Local 890 was an *active participant* caused damages to the plaintiffs." (Emphasis added). Local 890 argues that the district court misinterpreted section 6 of the Norris–LaGuardia Act to impose liability when picketers commit illegal acts in violation of the Local's policies, and thus insists that we review the district court's liability determination de novo.

 Local 890 also contends that the court's conclusion is inconsistent with its findings-of-fact. These findings include the statement: "There was no evidence that officials of Local 890 directed anyone to damage or destroy property." From this perceived inconsistency, Local 890 infers error in the court's application of section 6. However, this statement is easily reconciled with the court's finding of liability under Norris–LaGuardia. The Union's active participation in conduct in violation of state law need not include an

16. *See Phelan v. Local 305,* 973 F.2d 1050, 1061 (2d Cir.1992) ("An international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts."); *Chapa v. Local 18,* 737 F.2d 929, 932 (11th Cir.1984) (knowledge of illegal acts committed by the local union is not enough to require the international to intervene.)

order to destroy property. Moreover, destruction of property, although a foreseeable result of strike misconduct, is not a requirement of section 6.[17] We therefore decline to review the district court's application of Norris–LaGuardia de novo. It is clear to us that the district court did not misinterpret the meaning of section 6.

 Our review of a district court's application of the law to the facts is for clear error. *See Masayesva v. Zah,* 65 F.3d 1445, 1453 (9th Cir.1995). Moreover, "review under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed." *Exxon Co. v. Sofec Inc.,* 54 F.3d 570, 576 (9th Cir.1995), *aff'd,* — U.S. —, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996).

 We now turn to whether the evidence in the record provides the required clear proof of Local 890's unlawful conduct. To repeat, the clear proof standard of Norris–LaGuardia's section 6 requires proof which is clear, convincing, and unequivocal. *See Gibbs,* 383 U.S. at 737, 86 S.Ct. at 1143. Local 890 asserts that the evidence in the record does not satisfy this stringent requirement. It argues that in each incident of illegality, union leadership was not present, had no knowledge of the incident, or took action to prevent or curtail the wrongful conduct. This contention does not find support in the record.

These leaders were often present. The record conveys several sightings of Arturo Castro, a Local 890 business agent. Castro was present when picketers committed violent acts and vandalized the property of Growers. And on at least one occasion, Castro himself trespassed onto a Grower's field to confront a nonstriking worker. Teresa Escamilla, one of the Local's picket captains, did the same. Authorities arrested Escamilla. Furthermore, Local 890 did have knowledge of the unlawful incidents. For example, it knew of the conduct of both Castro and Escamilla but failed to discipline either, and allowed each to keep his position of authority. Moreover, Local 890 did not always act to prevent or curtail the wrongful conduct. Ybarrolaza advised Local 890 officials against the practice of field picketing and to reduce the number of picketers. But, as the district court properly found, the Local dispatched "picketers to fields belonging to plaintiffs, with neither limits on the number of picketers nor sufficient numbers of picket captains to ensure that order was maintained." District Court's Findings of Facts and Conclusions of Law, p. 4.

 Section 6 draws its force from the principle that unions ought not "be held liable for damage done by acts beyond their practical control." *See Gibbs,* 383 U.S. at 737, 86 S.Ct. at 1143. "What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law...." *Id.* at 739, 86 S.Ct. at 1146. This is not a situation where the damage complained of was beyond the Union's practical control. The evidence presented supports a conclusion, based on *clear proof,* that the Local authorized or participated in conduct alleged by Growers. Accordingly, the district court did not clearly err by finding the Union liable in this case.

### 2. *Growers' Cross–Appeal*

 The district court noted that actual damages to Growers were widespread, and divided them into two categories: damaged property and lost profits.[18] However, the court failed to apportion these damages to the Growers' respective cause(s) of action.

---

**17.** Local 890 also calls to our attention the district court's finding that the Union disseminated leaflets which instructed picketers to strike peacefully. However, as the Local itself concedes, the district court specifically found that the Union neglected to enforce its public antiviolence position. Again, we cannot agree with the Union that this finding of fact contradicts the court's judgment.

**18.** Specifically, the court found that picketers entered the fields of Growers, overturned cartons of harvested crops, flattened tires of harvesting equipment, and smashed the windows and windshields of Growers' vehicles. Picketers also threatened nonstriking contract workers. The court noted that, in many instances, Growers called the police because nonstriking workers feared for their safety.

We conclude that, aside from the issue of the Union's liability under California Civil Code § 51.7 which we address separately, this failure is harmless. We review a district court's damage award for an abuse of discretion. *See Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1495 (9th Cir.1995). Neither party challenges the district court's assessment of damaged property.

### a. Lost Profits

■ Both Growers and Local 890 submitted expert testimony on the issue of lost profits. The union's expert testified that there were no lost profits, while Growers' expert estimated loss at an amount in excess of three million dollars. The district court rejected each, as it was entitled to do, and set the damages at $500,000. The district court observed that the actual amount of lost profits was difficult to determine. Growers claim that $500,000 is an arbitrary and insufficient award.

■ We disagree. An approximate determination where the "evidence shows the extent of damages a matter of just and reasonable inference" will be sustained. *Sutton v. Earles,* 26 F.3d 903, 918 (9th Cir.1994). The court rejected Growers' theory of damages because it relied on an "extremely favorable market rate" and required every crop to be of "premium quality." It then awarded a fraction of Growers' proposal, presumably based on what it considered to be more realistic factors. We believe the district court's award to be a fair assessment of Growers' loss.[19] We therefore affirm this portion of the award.

### b. California Civil Code § 51.7

Growers next argue that the court failed to designate and apportion liability pursuant to California Civil Code § 51.7. Among other things, Section 51.7 seeks to protect Californians from violence or the threat of violence, committed against their persons or property, because of their position in a labor dispute.[20] The Growers are attracted to the possibility of exemplary damages and attorney fees provided for in section 51.7's remedial counterpart, California Civil Code § 52(b).

■ The district court's failure to confront explicitly section 51.7 leaves open only two possibilities; either that the amount of damages awarded included a section 51.7 recovery, or that it did not. On this record we cannot ascertain which is the case.[21]

We must remand this case to the district court to permit it to inform us what, if any, portion of the damages awarded to the Growers is attributable to a violation of section 51.7 and awarded pursuant to section 52(b). The district court should of course add addi-

---

**19.** Growers' key contention on appeal is that the district court is bound by the testimony of Growers' expert. They argue that the court implicitly accepted the Growers' theory of damages when it rejected defendant's expert. We reject this argument. The district court did not err in this respect.

**20.** The parties disagree on whether § 51.7, which applies to "all persons within the jurisdiction of this state," can be invoked by a corporation.

**21.** In bench trials, Fed.R.Civ.P. 52(a) requires a court to "find the facts specially and state separately *its conclusions of law* thereon." "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the trial court's decision." *See Barnett v. Sea Land Service,* 875 F.2d 741, 744 (9th Cir.1989). Failure to comply with the strictures of Rule 52(a) requires reversal when a full understanding of the issue presented on appeal is impossible without the aid of more specific findings. *See Ocean Garden, Inc. v.*

*Marktrade Co., Inc.,* 953 F.2d 500, 508 (9th Cir. 1991).

Growers contend that the district court erred by refusing to allocate damages under California Civil Code § 52(b). But without knowing whether the court based its liability determination on § 51.7, we cannot resolve that issue. For example, there would be no reason for us to entertain Growers' contention that liability under § 51.7 is appropriate in this case, if the district court, in fact, premised its liability finding on that statute. Our review would be limited to whether the court's failure to award special damages under § 52(b) constituted an abuse of discretion. *See Odima,* 53 F.3d at 1495. If, however, the district court rejected the Growers' § 51.7 claim, we would review that decision de novo. *See Saratoga Fishing Co. v. Marco Seattle, Inc.,* 69 F.3d 1432, 1437 (9th Cir.1995), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997). We simply cannot make this threshold determination on the basis of the information presented by the district court's judgment of liability.

tional damages under California Civil Code §§ 51.7 and 52 to the judgment if such damages were mistakenly omitted. We are reluctant to rely solely on the district court's curt rejection of the Growers' request that it find that the Union violated section 51.7 and to reconsider its damage award in light of section 52(b).[22] That explanation stated that "it found contrary to the requested amendments." If so, the district court's response to our limited remand properly would be "none." Should that be the proper response the district court should set forth its reasons for the holding.

## C. Sanctions

Lastly, Growers cross-appeal the district court's decision to impose Rule 11 sanctions on Growers' counsel for submitting false declarations. Growers argue their counsel was justified in filing the declarations because it had no reason to question the declarants' authenticity. The International also appeals the sanctions award on the grounds that it presented clear evidence that Growers and their counsel knowingly perpetrated a fraud on the district court and should reimburse the International for its entire defense—over $730,000.00. We affirm the sanctions award in all respects.

■■■■ We review all aspects of a district court's Rule 11 determination for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990). "A district court would necessarily abuse its discretion if it based its rule on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* Such a standard requires that we "uphold any district court determina-

tion that falls within a broad range of permissible conclusions." *Id.* at 400, 110 S.Ct. at 2458.

■■■■ Rule 11 imposes a duty on attorneys to certify by their signature that (1) they have read the pleadings or the motions they file and (2) the pleading or motion is "well-grounded in fact," has a colorable basis in law, and is not filed for an improper purpose. Fed.R.Civ.P. 11; *Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir.1994). Counsel, of course, may not avoid "the sting of Rule 11 sanctions by operating under the guise of a pure heart and empty head." *Ricks*, 31 F.3d at 1488 (quoting *Zuniga v. United Can Co.*, 812 F.2d 443, 452 (9th Cir.1987)).

■■■■ Growers filed suit against the International on the strength of eleven self-styled "smoking-gun" declarations tying it to the strike violence. Counsel obtained these declarations from its private investigator Victor Vidal.[23] After the International deposed Vidal and the eleven declarants, serious issues of credibility and authenticity surfaced. For instance, Vidal admitted he did not possess a private investigator's license and was unable to complete his deposition without an interpreter. In addition, the International uncovered numerous inconsistencies between the declarants' sworn deposition testimony and their previous declarations. Despite these developments, counsel filed the eleven declarations in response to the International's motion for summary judgment and sanctions.

Although it initially denied sanctions, the district court reopened the issue after the International submitted evidence that three of the declarants were impostors. Counsel defended its actions by attempting to shift blame to Vidal and by pleading ignorance.

---

22. Growers moved the district court, pursuant to Fed.R.Civ.P. 52(b), to amend its factual findings and legal conclusions to state liability in terms of the causes of actions pled in their first-amended complaint. In particular, Growers urged the court to find that the Union violated § 51.7 and to reconsider its damage award in light of § 52(b). However, the district court's order denying Growers' request to amend its findings is not helpful. The court's explanation that "it found contrary to the requested amendments" makes no sense because the Growers had requested, as part of the amendments, assignment of liability on any of the causes of action pled in

their complaint. The district court must have found for Growers on at least one of their causes of action.

23. Vidal's reliability and credibility were crucial to Growers' lawsuit. Without conducting an inquiry into Vidal's background, counsel accepted at face value Vidal's representation that he held a private investigator's license and was fluent in both English and Spanish. Relying on Vidal's word, counsel used Vidal as interpreter and translator in transcribing all but two of the "smoking-gun" declarations into English.

We agree with the district court that by blindly relying on Vidal under these circumstances, counsel violated its duty to conduct a reasonable inquiry to determine that the declarations were "well grounded in fact." *See Cooter & Gell,* 496 U.S. at 393, 110 S.Ct. at 2454; *see also Smith,* 31 F.3d at 1488. On this record, we cannot say that the district court abused its discretion by finding that three of the declarants were in fact impostors or that there was insufficient evidence that counsel had knowingly and willfully attempted to deceive the court.[24]

■ Bearing in mind our deferential review in these matters, we also conclude that sanctioning counsel for $700.00 in costs and $4,000.00 in attorneys fees, as opposed to a larger amount, was not an abuse of the district court's discretion. *See Cooter & Gell,* 496 U.S. at 404, 110 S.Ct. at 2460.[25]

**AFFIRMED IN PART; REVERSED IN PART.**

KLEINFELD, Circuit Judge, dissenting in part:

I concur in all of the opinion except section 2(C), regarding Rule 11 sanctions against the Growers' attorneys. I respectfully dissent as to the sanctions, and would reverse that award. In my view, the district court was misled by the Teamsters' attorneys into a conclusion for which there was no foundation.

The conclusion, the basis for the sanctions, was that the Growers attorneys had filed declarations by imposters, people who claimed in the declarations to have picketed

violently at the Local's behest, but who were not really the individuals named in those declarations. The judge did not conclude that the sanctioned attorneys willfully or knowingly sought to deceive the court. Rather, he found that the attorneys should have been more careful to verify the declarations, and were gulled by a private investigator they should not have trusted.

The majority assumes that the declarations were in fact by imposters, and that the Growers' attorneys presented a "pure heart and empty head" defense. The assumption is mistaken. The Growers' attorneys' position is that the declarations were true, by the persons who purported to make them, or at least they had no reason after due inquiry to suppose the contrary. The district judge concluded that the declarations were by imposters, as the Teamsters argued, but that alone does not suffice to support sanctions. If, as I think is the case, the Growers' attorneys had good reason to think the declarations were genuine and true when they filed them, they were entitled not to be sanctioned. Fed.R.Civ.P. 11(b)(3). A lawyer should not have to investigate independent investigators he hires and witnesses whose plausible affidavits he files, or else be in jeopardy of Rule 11 sanctions if opposing counsel attacks them.

The Growers' attorneys sought the people named in the police reports on the violent incidents for declarations. They could not find them themselves, so they engaged a private investigator. The attorneys hired Vi-

24. Contrary to the dissent, we do not affirm the district court's Rule 11 sanctions award solely on the ground that Growers' counsel submitted false declarations. We affirm the sanctions award because Growers' counsel was duty bound under Rule 11 to make further inquiries to determine whether the eleven declarations were "well grounded in fact." *See Cooter & Gell,* 496 U.S. at 393, 110 S.Ct. at 2454. The defendants demonstrated, inter alia, that: (1) Vidal, "the translator and interpreter", could not complete his deposition in English; (2) numerous inconsistencies existed between the declarations and the declarants deposition testimony; (3) several of the declarants were unable to produce proper identification; and (4) Vidal, "the private investigator," was unlicensed. At the sanctions hearing, when asked to respond to the Teamsters' showing that three of the declarants

were imposters, Growers' counsel stated "if there was some misconduct by the investigators, we're victims also and I'd like to know what is going on here as well." Elsewhere, when asked for an additional response to the Teamsters' evidence, Growers' counsel stated "I hired [Vidal] to bring me witnesses, and he brought me witnesses, and I assumed those people were who he assumed they were." Counsel's blind reliance on Vidal is strong support for the district court's sanctions ruling, a ruling which is accorded great deference by the reviewing court. *See id.* at 400, 110 S.Ct. at 2458.

25. The International's argument that the district court's sanction award encompasses "all of its fees and costs related to [Growers'] phony 'smoking-gun' witnesses" is belied by the record.

dal as their investigator because they had become acquainted with him when he worked for a detective agency they had used in another case, and he spoke Spanish and English. The Teamsters apparently persuaded the judge that the attorneys should never have hired Vidal because he was, unbeknownst to them, unlicensed, he had been involved in a narcotics case and had acted for the United States as an informant, and his bilingual skills were not very good.

I do not see why it is the lawyer's fault that his detective turns out to be unlicensed, any more than it is a client's fault if his lawyer turns out to be unlicensed, or a patient's fault, if his doctor turns out to be a fraud. The relevant California statute makes it a misdemeanor if a person "knowingly engages an unlicensed investigator after being notified in writing by the bureau of the private investigator's unlicensed status." Calif. Business & Professions Code § 7523(b). The predicate, knowledge and written notice, was absent here. That Vidal had no license makes the lawyers his victim, just as a patient or client is a victim of an unlicensed doctor or lawyer. There was nothing in the record to show that the attorneys should have thought Vidal an untrustworthy person just because the government had trusted him to act as an informant. Had they known he had acted as an informant (the Union lawyers argue that the Growers' lawyers should have run a computer search and turned up newspaper articles or a decision mentioning this), they might as reasonably suppose that if he was good enough for the United States government, he should be good enough for them. As for Vidal's language skills, it is one thing to talk with a farm worker in Spanish and a lawyer in English, and another to answer questions at a deposition. The Growers' attorneys used a translator on at least some occasions when they took the declarations of the farmworkers Vidal brought in. There is nothing in the record to show that the Growers' attorneys had reason to fear that their investigator was bringing in ringers.

There are two grounds for the conclusion reached by the district court that the people Vidal brought in were in fact not who they purported to be. First, when they were deposed, the Union's lawyer developed some inconsistencies and impeachment evidence. That is the virtue of the ancient truth-finding mechanism of cross-examination, and does not require the party offering the evidence to withdraw it. The inconsistencies and impeachment would not make a reasonable lawyer think the declarations were false or fabricated.

To the extent the impeachment and inconsistencies might matter, the threatening conduct the Union attorneys used to obtain them undermined their significance. For example, with Betancurt, one of the people the Union claims were imposters, the Union's lawyer started off the deposition by getting Betancurt to admit he was in the United States illegally. Then he asked "Who told you it would be all right if you came and just told the truth?" and said "I can call the—you know I can call the immigration right now, right?" The Union attorney's threat appeared to be an innuendo that the truth alone would not protect Betancurt from adverse consequences—if his testimony did not please the Union's attorney, the attorney would call the immigration authorities. *Cf.* California Rule of Professional Conduct 7–104 (a lawyer "shall not threaten to present criminal, administrative or disciplinary charges to obtain an advantage in a civil action."). Considering the intervening threats by the Union's attorneys, the Growers' attorneys could reasonably credit what the witnesses said before the threats as the truth and discount any contradictions made after the threats.

On the Friday before the Monday start of trial, the Union's attorneys filed a motion to disqualify the Growers' attorneys and for sanctions, accompanied by what looked like depositions purporting to be by the witnesses whose declarations the Growers' attorneys had used. The "depositions" contained testimony by individuals purporting to be a number of the Growers' declarants, denying that they had ever made the declarations, and denying that they were the individuals who had been deposed. Basically, the apparent depositions said "I am the real Mr. X, and the declaration and deposition purporting to

be me were by imposters." The judge held a hearing Monday on an order to show cause, and the Growers attorneys explained that they had relied on Vidal and had no reason to think anything was wrong with the witnesses. The district judge assumed that the witnesses had in fact been imposters. Because the trial was starting and the witnesses were hard to locate or in Mexico, it was not practical to bring them in. Also, as the Growers' attorney explained, many of the witnesses were illegal aliens without identification who "weren't our clients, they weren't our friends, these were the people who confessed to doing damage to our clients." The judge assumed the witnesses had been imposters.

At that point, where it was assumed that Growers' declarants were imposters, I think the district court made a prejudicial error. There was not adequate foundation to establish that the witnesses were imposters. The problem with foundation is that the purported depositions saying so were misleading fake depositions. The Betancurt document, for example, says "Deposition of Arturo Bravo Betancurt" on the cover, and has the caption, spacing, court reporter identification, typography, and formal language typical of a deposition. But unlike an authentic deposition, there was no notice to opposing counsel and no opportunity for opposing counsel to be present and to cross examine, as is required under Federal Rule of Civil Procedure 30. Union counsel, Mr. William A. Sokol of Van Bourg, Weinberg, Roger & Rosenfeld, the same lawyer who had engaged in the threatening cross examination quoted above, was present, but no one was present for the Growers. Most of us (including me) would have been fooled by the misleading appearance into thinking the papers were depositions, and I suspect that happened to the trial judge.

The fake depositions may be sworn declarations. Betancurt's is signed and recites that he was sworn. The others are not signed but contain the court reporters' statements that the witnesses were sworn. But the Union prevented the Growers' attorneys from having a fair chance even to learn whether the fake depositions were real sworn statements. Though the Union's attorneys filed complete copies of the fake depositions under seal with the court, they served redacted copies on the Growers' attorneys. The redacted copies hid the court reporters' names, addresses, and numbers, the translators' names, addresses and phone numbers, and the witnesses' addresses.

The district court perhaps could reasonably conclude that Vidal had brought in ringers, though the matter is far from certain. I do not think the District Court could reasonably conclude that the Growers' attorneys were careless in not knowing that they were submitting false declarations from imposters. Its implicit finding to that effect lacked adequate foundation. Sanctioning the Growers' attorneys for carelessly submitting declarations which they should have known were false was an abuse of discretion, because (1) the basis for concluding that the declarations were false was inadequate, and (2) the basis for concluding that the Growers' attorneys should have known their declarations were false was nonexistent.